UNITED STATES, Appellee

v.

JACKIE J. FLORENCE, Private First Class, U. S. Army, Appellant

1 USCMA 620, 5 CMR 48

No. 207

Decided August 26, 1952

LT. COL. James C. Hamilton, USA, 1ST. LT. James A. Hagan, USA, and 1ST LT. James F. Winchell, USA, for Appellant.

LT. COL. Thayer Chapman, USA, MAJ. George B. Springston, USA, and 1ST LT. Eugene L. Grimm, USA, for Appellee.

## Opinion of the Court

GEORGE W. LATIMER, Judge:

The petitioner was tried by general court-martial in Korea on April 17, 1951, upon a single charge and specification, alleging the theft of military payment certificates in the sum of $50.00, property of the estate of Alfred L. Alexander, and military payment certificates in the sum of $40.00, belonging to the estate of Wilbur C. Eagle, all in violation of the 93d Article of War, 10 USC § 1565. He was found guilty of the charge and specification, but by substitution the amounts were reduced to $40.00 and $30.00, respectively, to conform with the proof. He was sentenced to a dishonorable discharge, total forfeiture of pay and confinement at hard labor for five years. The convening authority approved and the board of review affirmed without opinion. We granted the petition for review, limited to the following issues: (1) Whether the military pay certificates and the extrajudicial statement

of petitioner were properly admitted in evidence, and (2) whether the sentence is excessive as a matter of law.

Petitioner was a clerk in an Army Graves Registration Section in Korea. His principal duty was to inventory the personal effects of deceased soldiers. The procedure in effect at the time was that the personal effects were removed from the bodies by a section sergeant and they were then turned over intact to petitioner for preparation of the individual inventories and safekeeping. Apparently effects were being stolen as on March 10, 1951, acting upon reliable information furnished him, the commanding officer of the Quartermaster Company directed one Sergeant Pinson, the section sergeant, to prepare personally a preliminary inventory of all personal effects thereafter removed from the corpses. On March 12, 1951, the sergeant inventoried the property found on the bodies of Alfred L. Alexander, deceased, and Wilbur L. Eagle, deceased, without informing other members of

**621**

the section. In these preliminary inventories Sergeant Pinson listed by serial number and face value each military payment certificate counted by him. The effects, including the military payment certificates, were then turned over to petitioner. On the following day, March 13, 1951, petitioner brought two typed inventories covering the effects taken from the two deceased soldiers, which supposedly listed all property, to Sergeant Pinson for signature. At that time the sergeant compared the inventories with the lists prepared by him the preceding day and noted certain shortages in the listed military payment certificates. He then reported the circumstances to the company commander. The petitioner and one other member of the section, were then sent for and interviewed by him and requested to produce their wallets, which they did. The officer inspected petitioner's wallet and found a number of $10.00 military payment certificates. The serial numbers corresponded with at least 7 of the certificates shown on the list previously prepared by Sergeant Pinson. The company commander then advised petitioner of his rights under the 24th Article of War, 10 USC § 1495, and asked him where he obtained the certificates. Petitioner replied that he took them "from the effects" or "from the personal effects."

Petitioner first contends that the military payment certificates taken from ▮▮▮▮▮▮▮ ▮ his wallet and his subsequent oral confession were improperly received in evidence since they were obtained in violation of the 24th Article of War, supra, and of the Fourth Amendment to the Constitution. He argues principally that when he produced his wallet and submitted to a search of his pockets, on a direct request from his commanding officer, his compliance was not voluntary; that this search violated his constitutional rights and was, therefore, unreasonable; and that the safeguards afforded a civilian by the Fourth Amendment of the Constitution should be preserved to one who becomes a soldier.

At the outset we point out that it was petitioner's commanding officer who requested that the wallet be produced. The authority of a commanding officer to make or order an inspection or search of personnel and property under his control has long been recognized in military law. In CM 248379, United States v. Wilson, 31 BR 231, a board of review considered the lawfulness of a search of the persons. The facts were these: Reliable information had been received by the commanding officer that articles were being taken from Army mail packages. The accused was placed under surveillance, and when an object was noticed bulging out of his pocket he was taken into the presence of his commanding officer and was asked what he had in his pocket. He thereupon pulled out a watch box which contained stolen property. The board of review in its holding stated:

"'Authority to make, or order, an inspection or search of a member of the military establishment, or of a public building *in a place under military control,* even though occupied as an office or as living quarters by a member of the military establishment, always has been regarded as indispensable to the maintenance of good order and discipline in any military command . . . such a search is not unreasonable and therefore not unlawful.' JAG 250.413 July 23, 1930 and sec. 395(27) Dig Ops JAG 1912–40). (Italics supplied.)"

See also CM 335526 Tooze, 3 BR–JC 313.

The rule of the Wilson and Tooze cases is cited with approval in ACM 4023, Arteaga (1951), 1 CMR 632. In that case a search of accused's person and footlocker, directed by his commanding officer because of reliable information received, resulted in the discovery of three marihuana cigarettes and an envelope containing marihuana. It was there pointed out that searches and seizures have been made pursuant to military command, as distinguished from civil warrant, ever since the foundation of this Government, and that military law does not prohibit searches without warrant, citing United States v. Clark, 31 Fed 710, and In re Grimley, 137 US 147, 34 L ed 636, 11 S Ct 54. That decision points out that as

there is in the Manual for Courts-Martial no requirement for the affidavit of probable cause required by civil statute, an appropriate commanding officer's exercise of discretion in authorizing a particular search is the acceptable substitute and cannot ordinarily be questioned, citing ACM 1458, United States v. Worley, 3 CMR(AF) 424; ACM 3682, United States v. Hopkins, 4 CMR (AF) 553.

Probably the most able and exhaustive analysis and discussion of this entire subject from both an historical and legal standpoint is to be found in ACM 1458, United States v. Worley, supra, and attention is invited to that opinion. In that case the Judicial Council stated the following rule:

"The essential difference between military jurisdiction and civil jurisdiction is apparent. Under civil jurisdiction, the informant has no power alone to make a search. The magistrate who hears the evidence has no power alone to make a search. The officer who serves the process has no power in himself to make a search. It requires the combined use of all three before a valid search and seizure can be made. On the other hand, the Commanding Officer with respect to property under his control has plenary power. He is fully and directly responsible to his Government for all action necessary to perform his duties. He has the power of investigation to determine whether a search should be made and to execute a search or direct its execution. In other words, he has the power of Federal agents, the magistrate and the process server."

These authorities show good reasons, and many others are suggested, as to why a seizure rule different from the one prescribed for civilians is necessary in the military service. However, the Manual for Courts-Martial, United States, 1951, treats more fully with search and seizure and it may be the foundation for curtailing a commanding officer's powers. For that reason at this time, we neither adopt nor reject the former rule because in this instance the commanding officer's conduct did not breach civilian principles. We are attempting to carry out the congressional intent to grant to military personnel, whenever reasonably possible, the same rights and privileges accorded civilians. Accordingly, we have elected to determine if this search, tested by civilian practice, would be condemned as being unreasonable. If not, it would not, a fortiori, be unreasonable under military law. The civilian rule is to the effect that evidence obtained by a search made and property seized as an incident to a lawful arrest is not illegally obtained and is admissible. In the case of United States v. Rabinowitz, 339 US 56, 94 L ed 653, 70 S Ct 430, the United States Supreme Court stated (page 60):

"It is unreasonable searches that are prohibited by the Fourth Amendment. Carroll v. United States, 267 US 132, 147. It was recognized by the framers of the Constitution that there were reasonable searches for which no warrant was required. The right of the 'people to be secure in their persons' was certainly of as much concern to the framers of the Constitution as the property of the person. Yet no one questions the right, without a search warrant, to search the person after a valid arrest. The right to search the person incident to arrest always has been recognized in this country and in England. Weeks v. United States, 232 US 383, 392. Where one had been placed in the custody of the law by valid action of officers, it was not unreasonable to search him.

"Of course, a search without warrant incident to an arrest is dependent initially on a valid arrest. Here the officers had a warrant for respondent's arrest which was, as far as can be ascertained, broad enough to cover the crime of possession charged in the second count, and consequently respondent was properly arrested. Even if the warrant of arrest were not sufficient to authorize the arrest for possession of the stamps, the arrest therefor was valid because the officers had probable cause to believe that a felony was being committed in their very pres-

ence. Carroll v. United States, 267 US 132, 156–57."

In Welsh v. United States, 267 Fed 819 (CA2d Cir), cert den 254 US 637, 65 L ed 451, 41 S Ct 9, defendant was charged with attempting to bring, and bringing, into the United States from a foreign country a certain tangible form of communication, to wit, a certain letter. The U. S. Court of Appeals, Second Circuit, stated:

"December 27, 1917, the defendant filed a petition for the return of the letter, on the ground that it was seized on his person without any search warrant, in violation of the Fourth and Fifth Amendments of the Constitution. Judge Augustus N. Hand denied the petition. (DC) 247 Fed 239. It showed that defendant was arrested when committing a felony—i.e., an offense punishable by imprisonment for more than one year (section 335 of the Penal Code)—and the letter taken was the instrument of crime, the very thing which the act prohibited from being brought into the United States except by mail. It was the right and duty of the government to seize it, just as it would seize burglars' tools found on a defendant's person when arrested."

In Garske v. United States, 1 F2d 620 (CA8th Cir), the facts are stated by the court as follows:

"Briefly the facts are that a warrant had been issued for the search of a certain building known as No. 9 Main Street Northeast, in the city of Minneapolis. While the search was in progress plaintiff in error appeared in the room being searched, with a package under his arm, which, from its appearance, caused the prohibition officers to believe contained bottles of whisky. The soft drink parlor where the search was being made was operated by one Frank Johnson. One of the prohibition agents observed plaintiff in error as he entered the soft drink parlor through the rear door, bearing the package, which showed plainly the outline of two pint bottles. Johnson made some motions to plaintiff in error, causing him to start toward the front door. One of the prohibition agents called to another agent to stop him, which he attempted to do, but plaintiff in error ran toward the front door, and continued running until the pursuing prohibition agent caught him on the sidewalk outside of the building, took the bottles from him, tore the paper off, saw the Warwick whisky labels thereon, and brought him back into the soft drink parlor."

The court held the search and seizure proper, and stated:

"The theory on which the government alleges the seizure was proper, is not based on section 26 of the National Prohibition Act, but rests on the general doctrine that the arrest and search of plaintiff in error were justified by a reasonable and honest belief on the part of the officers making such arrest, search, and seizure, that a crime was being committed in their presence, viz. the misdemeanors described in the two counts of the indictment.

"It is no violation of the Fourth Amendment to the Constitution to search one lawfully arrested for a crime, and to take from him the instrumentalities or evidences of the crime. The constitutional provision referred to against search and seizure has reference to general searches for the purpose of obtaining evidence, and has no reference to evidence obtained from the person after legal arrest in a proper case with or without warrant. In Weeks v. United States, 232 US 383, 392, 34 Sup Ct 341, 344 (58 L ed 652, LRA1915B, 834, Ann Cas 1915C, 1177), the Supreme Court said that the right is always recognized 'to search the person of the accused when legally arrested, to discover and seize the fruits or evidences of crime.'

"In Ex parte Morrill (CC) 35 Fed 261, the court discusses the Fourth Amendment to the Constitution and says that it never was intended to prevent an arrest by a peace officer for a crime committed in his presence. 2 Ruling Case Law, 446–458; United States v. Rembert (DC) 284 Fed 996.

"If the arrest of plaintiff in error here was justified and legal, then the taking of the liquor from him was not a violation of the Fourth Amendment, nor the use of it in evidence a violation of the Fifth Amendment . . . ."

In United States v. Heitner, et al, 149 F2d 105 (CA2d Cir) the accused were convicted of possessing and operating an unlawful still, and conspiracy to do so. The principal witness against them was a former conspirator. One of the defendants complained that the admission against him of a paper found in his pocket at the time of his arrest was improper. This paper bore the telephone number of a prune pitter, and since the still was being used to make liquor out of prunes there was basis for an inference that the defendant wished to make use of the prune pitter. The court said:

". . . As to its competency, it has long been established that the person of one lawfully arrested may be searched, and that anything found may be used against him. Agnello v. United States, 269 US 20, 30, 46 S Ct 4, 70 L ed 145, 51 ALR 409. Heitner appears to confuse this doctrine with that which forbids such a search to extend generally to the premises in which the arrest is made. United States v. Lefkowitz, 285 US 452, 52 S Ct 420, 76 L ed 877, 82 ALR 775."

We lay aside the sweeping coverage of the previous service rule and apply the foregoing principles of law to the facts of this case. There is no doubt concerning the fact that the accused was placed in arrest or confinement after he was interviewed by the company commander, and if the search was incidental to this then it was reasonable. The Manual for Courts-Martial, U. S. Army, 1949, defines arrest as moral restraint imposed upon a person by oral or written orders of competent authority, limiting his personal liberty in the disposition of charges. It further provides (Manual for Courts-Martial, U. S. Army, 1949, page 15, paragraph 19d):

"(1) Preliminary inquiry into offense.—No authority shall order a person into arrest or confinement unless he has personal knowledge of the offense or has made inquiry into it. Full inquiry is not required, but the known facts should be sufficient to furnish reasonable grounds for believing that the offense has been committed by the person to be restrained."

Under military procedure arrest may be the final step in a series of disassociated acts from receipt of information of a supposed offense to confinement, or it may be the end of a sequence of events so closely interrelated that it is impossible to fix the point of actual deprivation of liberty. In this case it appears the latter situation existed and that the initiatory step in the arrest was the order directing the accused to report. For the purposes of this case we will make that assumption and test the legality of the initiatory action by determining whether it was founded on a reasonable belief that the accused had committed a crime. At that time the company commander had knowledge that effects taken from deceased soldiers were being misappropriated; that a preliminary inventory had been taken of the effects of two deceased enlisted men; that the inventoried property had been turned over to the accused; that accused had prepared and submitted an inventory which was represented as including all of the property turned over to him; that the inventory as submitted failed to account for a number of military pay certificates; and that the certificates were of such a nature that they could be easily secreted or negotiated. We conclude that this information furnishes a sufficient predicate for the commanding officer to reasonably believe that a crime had been committed by the accused. Accordingly, the order to report was issued upon probable cause and the search was reasonable under the circumstance.

Having held the search legal, petitioner's contention that his oral confession, made contemporaneously with the search and seizure was involuntary because it was the fruit of an unlawful act, must fail. He was properly advised concerning his rights under the 24th Article of War, supra, and there-

**625**

after voluntarily made the statements. They were, therefore, admissible.

The second issue presented to us is grounded upon the contention that the court-martial erred in im- ██ posing a sentence for one major offense when the evidence does not establish a single transaction. By comparing the serial numbers of the seven $10.00 military payment certificates found in petitioner's wallet with Sergeant Pinson's lists, the court-martial found that one theft amounted to $40.00, the other to $30.00. The difficulty in identifying one certificate arose because one serial number on the preliminary list was difficult to identify. As a result of the finding by combining the two thefts into a single specification the court-martial found the total value in excess of $50.00, thereby permitting the imposition of five years' confinement, whereas had the thefts been committed separately the maximum could not exceed one year in each specification. Manual for Courts-Martial, U. S. Army, 1949, par 117c, page 137.

The Manual for Courts-Martial, U. S. Army, 1949, par 180, at page 240, states:

"When a larceny of several articles is committed at substantially the same time and place it is a single larceny even though the articles belong to different persons. Thus, if a thief steals a suit case containing the property of several individuals, or goes into a room and takes property belonging to various persons, there is but one larceny, which should be alleged in but one specification."

In Wharton, Criminal Law, 12th ed. Vol 2, sec 1171, page 1489, we find the following analysis:

"When two or more articles are taken successively, it is to be considered whether such taking is continuous, so as to form part of one transaction, to be indictable as such. And the answer is, if the transaction is set in motion by a single impulse, and operated upon by a single unintermittent force, it forms a continuous act, and hence must be treated as one larceny, not susceptible of being broken up in a series of offenses, no

**626**

matter how long a time the act may occupy. . . ."

And we further find in 52 Corpus Juris Secundum, Larceny, Par 60, pages 854–855:

"If the articles belonging to different owners are taken under circumstances constituting a single crime and the aggregate value of the things taken exceeds the statutory amount, the crime is grand larceny; but if the circumstances render the takings separate offenses, and the value of the articles taken from any one owner does not equal the statutory amount, not grand larceny but only a series of petit larcenies has been committed, and the separate takings cannot be united in a single indictment so as to secure a conviction for the higher crime."

A very able analysis of this problem is found in Joslyn v. State, 128 Ind 160, 27 NE 492. In that case the information charged larceny from two separate individuals. That court considered the question from the standpoint of whether the count of the information was duplicitous. The court stated:

". . . If the information alleged that the property of the two owners was stolen at the same time and by the same act, so that it could be affirmed that there was a single larceny, we should, perhaps, be able to sustain the information. But the difficulty that arises cannot be solved by assuming that there was a single act, unless, as a matter of law, it can be adjudged that the larceny of property belonging to different owners, committed on the same day, constitutes a single crime; for there are no facts alleged tending to show that there was one indivisible offense. As there is only a single count, we are required to decide whether the larceny of property belonging to two different persons can, as matter of law, be considered to constitute one offense; . . . . Suppose, for the sake of illustration, that the appellant had been convicted of stealing Gunnison's property, and was subsequently indicted for stealing Parham's property, would the conviction be prima

facie a bar to the second prosecution? To our minds it is clear that it would not be, although it is possible that, if it appeared that the property of both owners was taken in a single and indivisible act, the first conviction would bar further prosecution. If the first prosecution would not be a bar, and we think it would not be, it must be for the reason that prima facie there are two offenses. . . .''

From the foregoing authorities, it becomes apparent that the question here involved is one of law and fact to be determined from the evidence in the record. The Government argues that *"apparently* all the effects of the two deceased soldiers were turned over to petitioner at the same time." (Emphasis supplied). The manner in which this statement is phrased is indicative of the doubt which arises as to whether this factual situation can be found in the evidence. The record indicates that the personal effects of Alexander and Eagle were turned over to petitioner on March 12, 1951. It was on the following day, March 13, 1951, that Sergeant Pinson noted the discrepancies heretofore mentioned. There is no evidence, either direct or circumstantial, that the petitioner pilfered these military payment certificates at substantial-ly the same time. Speculation upon this point might lead to either of two conclusions, first that petitioner might have taken these military payment certificates at the same time and by a single impulse or, second, that he might have taken them at entirely different times on March 12th or March 13th and upon entirely separate and distinct impulses. Neither the court-martial nor this Court should speculate about a material fact, and the burden of proof is upon the Government to prove the essential elements of the offense carrying the greater penalty. We are of the opinion that in this case the evidence is sufficient only to permit a finding of two separate and distinct larcenies, each of the value of $50.00 or less and more than $20.00, the maximum punishment of confinement for each of which is prescribed in Manual for Courts-Martial, U. S. Army, 1949, paragraph 117c, page 137, as one year.

We therefore affirm the decision of the board of review as to the finding of guilty, but reverse as to the sentence adjudged. The case is remanded to The Judge Advocate General of the Army for appropriate action not inconsistent with this opinion.

Chief Judge QUINN and Judge BROSMAN concur.