UNITED STATES, Appellee

v

FRED C. TAYLOR, Lieutenant Colonel, U. S. Army, Appellant

6 USCMA 289, 20 CMR 5

290.

No. 6473

Decided August 26, 1955

*Captain Albert C. Malone, Jr.*, argued the cause for Appellant, Accused. With him on the brief were *Colonel F. Granville Munson (Retired), Lieutenant Colonel Jackson K. Judy* and *Lieutenant Colonel Edward Duvall.*

*First Lieutenant A. Kenneth Pye* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel Thomas J. Newton.*

### Opinion of the Court

PAUL W. BROSMAN, Judge:

The accused Army officer—formerly the provost marshal of a port unit located at Pusan, Korea—was found guilty under eleven specifications of larceny, in violation of Article 121, Uniform Code of Military Justice, 50 USC § 715, and another alleging a violation of a lawful general regulation, contrary to the provisions of Article 92, 50 USC § 686. He was sentenced to be dismissed from the service, to forfeit all pay and allowances, and to be confined at hard labor for eight years.

The convening authority disapproved the findings of guilty returned under three of the larceny specifications, and under another reduced the value of the property allegedly stolen to an amount less than $20.00. After approving the remaining findings, he reduced the sentence to confinement by two years. After a board of review in the office of The Judge Advocate General had affirmed the approved findings and the sentence, we granted the appellant's petition for review to determine (1) whether accused was prejudiced by the reception of certain hearsay evidence, and (2) whether unreasonable multiplicity was present under the charge alleging a violation of the Code's larceny Article.

### II

During the month of June in 1953 Colonel Taylor became the provost marshal of the 7th Major Port, Pusan, Korea. For operational purposes his office was divided into two branches or divisions. One—the customs section—

was responsible for the confiscation of smuggled items and of military payment certificates found in the possession of unauthorized persons. After acquiring property of this character, it was customary for the personnel assigned to this division to prepare receipt forms for the goods or money seized.

These receipts, together with the money or goods obtained, were as a usual thing transmitted in duplicate to the second branch of the office, known as the administrative section. Either the accused or one of his subordinates customarily would sign the receipts presented by the customs section and accept custody of confiscated property. One copy of each receipt was thereafter returned to the customs section and one retained in the administrative section's files. As funds and property were received from time to time by personnel connected with the administrative section, the usual office practice directed the placement of the goods or money, together with a copy of the receipt, in the administrative office safe. Thereafter, a schedule of collections, which detailed the accumulated intake would be prepared for the accused's signature. Finally, under normal procedure, the schedule of collection forms, together with the items confiscated, would be delivered by the provost marshal to an Army finance office.

Evidence introduced at the trial by the Government for the purpose of establishing the allegations of Specification 1 of Charge I—the theft of a diamond ring—indicated that on December 1, 1953, the property in question came into the possession of a sergeant named Blocker during a card game in which another player, one Berger, pledged it to the former in return for a loan of $1,200.00. Disgruntled as a result of numerous setbacks in the course of play, Berger thereafter complained to military authorities that he had been cheated, physically assaulted and wrongfully deprived of his ring. Following this complaint, the accused confiscated the ring from Blocker, and informed him that it would not be returned to his control. Soon afterward the appellant presented the ring as a gift to a Sergeant Santini, who was

**292**

serving at the time as chief investigator of the 7th Port's investigation section.

Once it became apparent that the accused's unwonted generosity had come under scrutiny, Santini approached Berger and informed the latter that he (Santini) and Taylor were "in trouble." He thereupon offered Berger $200.00 in travelers' checks, plus a tape recorder, in return for which Berger was to prepare a letter tendering his assistance to the accused, and to state to investigators that Santini had legitimately purchased the ring. Although Berger appears to have carried out his part of the bargain, he failed to receive the ring—as the illicit agreement had provided he should.

Specifications 9 through 15 of Charge I alleged that the accused, on seven separate occasions, had stolen other confiscated property which had come into his possession. Prosecution evidence showed that he was removed from his assignment as provost marshal on January 27, 1954. His successor, a Major Manning, did not receive confiscated items of any nature from the accused at the time he assumed the position, nor did he find any such property in the office safe.

An official audit of collections of confiscated property and "turn-ins" made to the finance office disclosed that during the period from July 28, 1953, to February 6, 1954, no such items had been received by finance officials from the accused's office. It further appeared that, prior to the time the appellant assumed the duties of provost marshal, "turn-ins" to the finance office were frequently made. The audit further showed receipts of confiscated property in the amount of $7,958.75 chargeable to the provost marshal, whereas finance records indicated "turn-ins" to the extent of only $4,235.10. The figures testified to by the auditor established a shortage of $3,723.65.

In a pretrial statement, Taylor admitted that it was the normal practice to surrender to the finance office seized military payment certificates when approximately $500.00 had been accumulated. Moreover, the testimony of a clerk formerly assigned to this partic-

ular unit antecedent to the assumption of command by the accused, indicated that a schedule of collection forms, together with the accumulated property, was delivered to the finance office approximately once per month.

Although the accused elected to remain silent on the merits of the trial, several witnesses expressed the view that the discovered shortage may well have been a product of the slipshod manner in which the provost marshal's office was operated, or due to the fact that confiscated property was frequently used to compensate informers—and not at all the result of the accused's peculations.

### III

In the initial claim of error, the defense contends that the testimony of three witnesses concerning certain extrajudicial statements made by Sergeant Santini amounted to hearsay, and that the admission of these declarations substantially prejudiced the accused. To support this position, appellate defense counsel remind us of our decision in United States v Kellum, 1 USCMA 482, 4 CMR 74, in which we held that the testimony of a witness may not be bolstered by a showing that he had made prior out-of-court statements consistent with his testimony on the stand. Thus —defense concludes—the hearsay statements attributed to Sergeant Santini were bad for two reasons, and could only have served to support a case against the accused so weak that without them the conviction under the diamond ring specification must fall.

Recognizing once more the soundness of the rule enunciated in the Kellum case, supra, we are nevertheless sure that it is inapplicable to the situation before us here. Santini, it must be recalled, was more than an ordinary witness; he was accused of committing the offense involving the ring in conjunction with the appellant. Therefore, his out-of-court assertions may quite properly fall within the rule which permits the admission of the statements of an accomplice of the accused, or of a person acting in concert with him—this for the reason that, for the purpose of determining admissibility, they must be treated as evidence of the conduct of a coconspirator. Paragraph 140$b$, Manual for Courts-Martial, United States, 1951.

It is also clear that a statement made by one conspirator during the life of the conspiracy, and in pursuance of it, may be accepted in evidence against all. Manual, supra. Since there is no doubt that Sergeant Santini acted as an accomplice of the appellant in withholding the ring in suit, we are called on to determine whether the assertions made by the former were uttered in furtherance of the common design to commit an offense. It they were, then we are sure that they were properly before the court-martial.

Federal authorities are legion which hold that statements made by a conspirator, once the common enterprise has reached its end, are inadmissible against coconspirators. See Lutwak v United States, 344 US 604, 97 L ed 593, 73 S Ct 481; Krulewitch v United States, 336 US 440, 93 L ed 790, 69 S Ct 716; Logan v United States, 144 US 263, 36 L ed 429, 12 S Ct 617; and Wharton, Criminal Evidence, 11th ed, § 714. However, not infrequently the commission of a criminal offense is followed immediately by an active attempt to conceal it. Thus, a rule has arisen to the effect that the declarations of a conspirator are admissible against a coconspirator not only when they are made during the perpetration of the offense, but also when expressed during the course of a subsequent attempt to conceal the crime and relating to it. Wharton, supra, § 715.

In United States v Goldstein, 135 F 2d 359 (CA 2d Cir), certain defendants were prosecuted for a conspiracy to defraud the Government of taxes on distilled spirits. A still operated by them had been seized and most of the conspirators arrested. Later, one of the accused persons approached a merchant from whom he had purchased large quantities of sugar for use in producing contraband alcohol, and requested that

**293**

the latter say nothing of the transactions if called as a witness. In holding that evidence of this request was admissible, the Court of Appeals for the Second Circuit observed that, in effect, the conspiracy had not ended—this for the reason that "efforts to avoid detection of the fraud which was the gist of the conspiracy were still timely though they might be fruitless."

In spite of these authorities, appellate defense counsel insist that under the Krulewitch decision, supra, declarations made during the course of an attempt to conceal a criminal conspiracy are inadmissible under all circumstances. We are unable to agree that this result was intended by the Supreme Court in that case. Krulewitch was convicted of conspiring with another—a woman—to induce the prosecuting witness to travel from New York to Miami for the purpose of prostitution. At the trial, the prosecuting witness was permitted to relate conversations between herself and the woman accomplice, which had taken place almost two months after the conspiracy had ended and all parties concerned had been arrested. Conceding that the chief objective of the conspiracy—that is, a transportation for prostitution purposes—had been completed before the reported conversation took place, the Government nevertheless urged that implicit in every conspiracy is a second, if subsidiary, plot with concealment as its sole objective.

Refusing to accept such a theory of presumed criminality, the Supreme Court held that the statements made by the female coconspirator were not admissible. However, that court did *not* hold inadmissible all declarations of a coconspirator made after the termination of the conspiracy, if an attempt at a concealment thereof is *established* by the Government. See Lutwak v United States, supra. In fact, the clear import of the Krulewitch and Lutwak cases— as well as the holdings of other decisions—is that, when a concealment is shown to be in furtherance of the conspiracy, statements of the sort before us here *are* admissible in evidence.

The record in the instant case is replete with evidence indicating that the accused and Sergeant Santini made prodigious and repeated efforts to conceal the larceny of the ring. A letter from the accused to Santini indicates the concern felt by the former regarding the investigation of his prior activities as provost marshal. In this correspondence, the accused admonished Santini to destroy certain receipts, and assured him that, if the "ring deal" was under investigation, then he (Taylor) would see that Santini received another gift in lieu of the first one. In another letter written to a Lieutenant Thompson, the accused insisted that the ring was returned to Berger, and that Thompson would shortly receive a copy of the receipt therefor. Santini, himself, testified that he had offered Berger $200.00 in travelers' checks in return for a receipt for the ring plus an exonerative letter from Berger to Colonel Taylor.

It is thus apparent that evidence— wholly independent of the statements made by Santini to third persons—fully established the existence of a plan conceived by the accused and the sergeant to retain control of the ring and to silence all claims of prior owners. In such a setting the extrajudicial declarations—made by Santini in pursuance of the common intent to conceal the larceny—were admissible in evidence against the accused.

However, should we assume *arguendo* that the testimony under attack did constitute inadmissible hearsay, we are sure that no prejudice to the appellant can have resulted. Sergeant Santini, himself, related under oath the very incidents established by the testimony of the other challenged witnesses. His testimony alone would have been sufficient to bind the accused securely in a circumstantial web of evidence which compels findings of guilty. Although this Court will not permit a finding based on hearsay to stand, when the record reveals that the dubious testimony is either repetitious or no more than cumulative, it is difficult to say that there existed a reasonable probability that it had measurable impact on the minds of the members of the court-martial. See United States v Isbell, 1

294

USCMA 131, 2 CMR 37; and United States v Brumfield, 4 USCMA 404, 15 CMR 404. And, although it be determined that the statement of a coconspirator made after the conspiracy's end should not have been admitted, reversal is not required unless the omission of the statement could reasonably have been expected to bring about a different result. Lutwak v United States, supra.

We are not faced here with a Kellum situation, in which the accused testified in his own defense, and thus the court-martial was faced with a clean-cut issue of fact—one of whether to believe the accused or to accept the version of a prosecuting witness whose testimony was supported by prior extrajudicial statements. In that case the danger of prejudice arising from the presence of hearsay declarations was real indeed. In the case at bar, however, the accused did not take the stand, and the Government's showing of guilt stands uncontroverted. We cannot say, therefore, that prejudice can have resulted from the admission in evidence of Sergeant Santini's utterances.

### IV

We turn now to the argument advanced by appellate defense counsel to the effect that Specifications 9 through 15 of the larceny charge amount to unreasonable multiplicity. The Government's proof of these alleged offenses consisted of receipts signed by persons attached to the provost marshal's office, which indicated that certain quantities of confiscated property—chiefly military payment certificates—were received in the administrative section. Since these documents bear various dates ranging from August 4, 1953, to January 3, 1954, it is apparent that the items concerned were amassed under the accused's supervision during the period when he made no "turn-ins" to the finance office. The Government has chosen to divide the missing amounts among seven specifications, rather than to aggregate the property allegedly stolen under a single one.

Both appellate Government and defense counsel agree that the rule announced in United States v Florence, 1 USCMA 620, 5 CMR 48, applies. There, we held—and clearly—that where the Government elects to aggregate the value of property allegedly misappropriated, it must produce evidence which will negate the possibility that separate larcenies occurred in fact. Similarly, if the Government chooses to separate an unexplained shortage into several specifications, then it is required to establish that each of the alleged offenses was distinct from its fellows. In both instances, the circumstances surrounding the situation involved will be construed in the manner most favorable to the accused. See United States v Stribling, 5 USCMA 531, 18 CMR 155.

We do not think that the Government here has introduced evidence sufficient to avoid the effect of the Florence and Stribling cases. Government counsel—both at the trial and on the appellate level—have argued unconvincingly that the accused was required to deliver confiscated property to the finance office at least once each month. The only support for such an assertion found in the record is the testimony of a single witness to the effect that, in his opinion, this was at one time the usage. However, the accused in a pretrial statement stated that, under his general practice, "turn-ins" were to be made when confiscated property of the value of approximately $500.00 had been collected. Moreover, we are unimpressed for this purpose by testimony to the effect that prior to July 1953 "turn-ins" from the accused to the finance section had been "frequent." Certainly, in the absence of more positive evidence, and viewed in the light most favorable to the defense, we cannot at all say that the Government succeeded in establishing a standing office policy requiring that the accused relinquish accumulated property at the end of each thirty-day period.

Under current Army Regulations, it is required that contraband property confiscated by military police personnel be retained in the custody of an officer who shall receipt for it, and shall main-

tain records showing the disposition eventually made. See SR 190–70–5. These Regulations further provide that such contraband property is to be reported either to the nearest disbursement officer, or to the appropriate Federal agency authorized to receive it. Significantly, no time limit is specified within which the possession of property confiscated by such personnel must be relinquished. In fact, the Regulations state that, "when no longer necessary," the confiscated property is to be disposed of by the responsible custodian.

Furthermore, Army Regulations do no more than provide that officers who are neither disbursing officers nor Class B agents—a category which includes a provost marshal—shall surrender funds to accountable finance officials "promptly." See SR 35–340–1. However, these Regulations are in direct contrast with the language of AR 35–140 which provides that disbursing officers must deposit with the Treasury all public funds not required for current expenditures *within thirty days of receipt*. Since Government appellate counsel are unable to cite Regulations which require such periodic payments on the part of military police officers in the situation of the accused, we are sure that current directives imposed no duty on him to render monthly accounts of confiscated property.

The case of Wilson v United States, 158 F2d 659 (CA 5th Cir) (1947), cited by the Government as dispositive of the multiplicity issue, is clearly distinguishable. There, the defendant was convicted under four counts of embezzling the proceeds of the sale of four United States Government savings bonds. However, the Court of Appeals was careful to point out that the defendant—an authorized agent—was *required* to account periodically for the proceeds of sale of such bonds. In the case before us, however, we are unable to say with certainty that the accused was under a duty to render any variety of periodic reckoning. Indeed, so far as we have been informed, the accused could have met his surrender obligations fully by means of one catch-all "turn-in" at the end of his tour as provost marshal.

Our conclusion is undisturbed by reason of the fact that the accused admitted in a letter to Sergeant Santini that he had missed "a couple of turn-ins." Of course, in certain settings proof of a single unexplained shortage may be sufficient to corroborate an admission of more than one larceny. See United States v Stribling, supra. However, the sketchy statement made by the accused here leaves too much to speculation and conjecture. For one thing, the relinquishments referred to by the accused in his letter conceivably may have related to the larceny specifications of which he was found not guilty. For another—and assuming that the admissions related to one or more of the remaining specifications—it is quite impossible to determine which of them were involved. In the absence of more specific information, therefore, we cannot in fairness conclude that the accused's extrajudicial admission supports the Government's view that the property embezzled was withheld in a series of seven independent acts.

Since we must conclude that the Government failed to establish that the larcenies alleged in Specifications 9 through 15 were separate, it is apparent that the law officer's instruction concerning the maximum permissible punishment was erroneous. Moreover, in reducing the adjudged sentence, the convening authority was also misinformed as to the maximum confinement he might lawfully approve. If the multiplied specifications had been properly charged as a single offense, the maximum confinement imposable by the court-martial would have been reduced by thirty years. Since we cannot know what sentence would have been before us had the court-martial, or the convening authority, been accurately advised in this respect, it is necessary that we require another punitive determination.

V

Accordingly, the record of trial is returned to The Judge Advocate General, United States Army, for submission to the board of review for reconsideration of sentence.

Chief Judge QUINN and Judge LATIMER concur.