UNITED STATES, Appellee

v

FRANK T. DICARIO, Private, U. S. Army, Appellant

8 USCMA 353, 24 CMR 163

No. 9644

Decided November 1, 1957

*First Lieutenant Gerald G. Barton* argued the cause for Appellant, Accused. With him on the brief were *Lieutenant Colonel James M. Scott* and *First Lieutenant Bert M. Gross.*

*First Lieutenant Richard W. Young* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Thomas J. Newton* and *First Lieutenant Edward S. Nelson.*

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

The accused was tried with one Mennine for several offenses arising out of the breaking and entry of a Unit Mail Room and the larceny of letters which contained, in the aggregate, almost $400.00. He was represented by a civilian lawyer and appointed military counsel. The primary issue at the trial was the admissibility of the accused's respective pretrial confessions. Both statements were admitted in evidence, and both accused were convicted of all charges. On review, a board of review set aside Mennine's conviction on the ground that his confession had been obtained in violation of Article 31, Uniform Code of Military Justice, 10 USC § 831, and was, therefore, inadmissible. However, it affirmed the findings of guilty as to this accused.

Two questions in regard to the accused's confession are presented by this appeal. One concerns the adequacy of the advice given to the accused as to his rights under Article 31. The second relates to the correctness of the law officer's instructions as to the extent the court members could consider the voluntariness of the accused's confession.

On the first issue, the substance of the accused's argument is that he was incorrectly informed by Criminal Investigation Detachment agents that he could refuse to answer only questions which might incriminate him. In United States v Williams, 2 USCMA 430, 9 CMR 60, we held that the provisions of Article 31 confer "rights far beyond those normally granted by the privilege against self incrimination," and require that the accused be advised that he need not make "*any* statement regarding the offense." We concluded that it was a violation of the Article to inform the accused that he could decline to make only an incriminating or degrading statement. The Williams decision was the basis for the board of review's reversal of the coaccused's conviction. And the accused maintains that his conviction should have been set aside on the same ground. The evidence, however, shows that Mennine and the accused were differently advised.

Two agents were especially active in questioning both accused. The agents testified that at one point in their separate questioning of each accused, Mennine was told, in effect, that he could not withhold information about the offenses if he did not commit them. The same advice was not given to this accused. On the contrary, he was consistently told on several occasions that he "need not make any statement regarding the accusation against him." One agent explained the difference in the explanation given to the accused and to Mennine as follow:

"Q. Well, then, you did not say that he could not remain silent on any or all points, did you? Didn't you tell him that he could only remain silent wherein the evidence or the statement would tend to incriminate or degrade him?

A. I told him that he need not make any statement regarding the accusation against him, yes, sir.

"Q. But, then you told him that if it was not as to that accusation that he had to make a statement, did you not?

A. I did not.

"Q. Did you not tell Dicario on several occasions that he did not have to make a statement if he was guilty of what he was charged?

A. Yes, I did tell him that he need not make a statement concerning the accusation against him, sir.

**355**

"Q. And did you not tell him on several occasions that if he was not guilty, as he said he was not, that there was no reason why he should not make a statement?

A. That point did not come up, sir.

"Q. It did not come up at any time?

A. No, sir.

"Q. And you did not say that in explaining paragraph 'b' of Article 31?

A. I am a little confused, I believe. Paragraph 'b' pertains to statements made regarding the accusation against the man. He was advised that he need not make any statement regarding or concerning the accusation against him.

"Q. Well, what did you tell him with regard to making a statement that was not as to the accusation against him?

A. I don't recall advising him on that point at all, sir.

"Q. You have testified several times in the course of this trial that you said to Mennine that he could not refrain from making a statement if he was not guilty, as he had said, is not that true?

A. That is true.

"Q. And you did not make that statement to Dicario at any time?

A. I did not, no, sir.

"Q. How do you differentiate between the two men as to your advice concerning subsection 'b' of Article 31?

A. The — Private Mennine maintained that he was innocent; it was followed in each case by a statement of who he thought had done the larceny, the robbery. Following this, he would say that he would rather not say who he thought had done it; he did not want to be a 'rat.'

"Q. Did Dicario deny through the entire interrogation that he was guilty of breaking into the mail room?

A. Yes, sir.

"Q. He did?

A. Yes, sir.

"Q. And you did not say to him after any one of those denials that he could not refrain from making a statement?

A. No, sir.

"Q. If it did not involve him?

A. No, sir."

The agent's testimony is uncontradicted. It is sufficient to support a finding that the accused ▮▮▮ was correctly informed as to his rights under Article 31. Consequently, we find no merit in this part of the accused's attack on the ruling admitting his confession in evidence.

For his second assignment of error the accused contends that the law officer incorrectly instructed the court-martial in connection with its consideration of the confession. The contested instruction is as follows:

"You have heard evidence bearing on the voluntariness of statements I have admitted in evidence. It is recognized that involuntary statements are often untrustworthy and unreliable. Therefore, the voluntariness of the statements before you—that includes the verbal statement from one accused as well as the written ones which you have in the form of exhibits—constitutes a matter you should consider in determining what weight, if any, you are to give to that statement. In deciding this latter question, you should be affected in no way by the circumstance that I have permitted the statement to be received in evidence, or any of these statements."

The instruction accords with our opinion in United States v Dykes, 5 USCMA 735, 19 CMR 31. Later, in United States v Jones, 7 USCMA 623, 23 CMR 87, we re-examined the question of what instructions should be given to the court-martial when the voluntariness of a confession is in issue. We concluded that the military practice should conform as nearly as possible to the prevailing practice in the Federal courts. We found that a majority of the courts favor an instruction in ▮▮▮ which the triers of the facts are advised that, despite the admission of a confession in evidence by the trial judge, they can "reject . . . [it] in toto" if they determine that it was not voluntary

before they reach the question of assessing its weight. Measured by that rule the law officer's instruction is not technically correct.

Not every instructional error is prejudicial. United States v Rodriguez-Suarez, 4 USCMA 679, 16 ▮▮▮ CMR 253. If the instruction does not relate to any matter in issue, the error can be disregarded. See United States v Jackson, 6 USCMA 193, 19 CMR 319. An erroneous instruction can prejudice one accused, but be entirely harmless as to a coaccused. In assessing the error, we must consider the evidence pertinent to this accused.

The evidence shows that the accused telephoned a Criminal Investigations Detachment agent from the post stockade and asked to speak with him in his office. The agent was busy and asked the accused if the purpose of the talk was "important." The accused indicated that it would be "worth . . . [the agent's] while." As a result, the accused was taken to the agent's office. He testified that when the accused entered he said to him, "Now, before you say anything to me, I want to again inform you of your rights under Article 31." The accused answered that he understood, and he said that he had "something he wanted to tell" the agent. Parenthetically, we note the agent testified earlier that he had read and explained Article 31 to the accused on at least two previous occasions in connection with the investigation. Once the accused reminded him he was "well enough acquainted" with the Article that he could, if the agent desired, "read" it to him. The accused made an oral statement. Later he dictated a statement, with the assistance of the agent, to a secretary in the Criminal Investigation Detachment office. While the latter statement was being typed by the secretary, the accused had dinner. When the typed statement was ready, the accused read and signed it. He also signed a certificate in which he acknowledged that Article 31 had been read and explained to him, that he had been informed of the offenses of which he was accused (they were separately listed),

and that he voluntarily made the statements which followed the certificate. .

Nothing in the prosecution evidence raises any issue of involuntariness. True, defense counsel examined the agent at length in regard to his understanding of Article 31 and obtained from him some confusing answers, but none of this testimony relates to the accused's understanding of the Article. All of the evidence shows that he was advised of his rights in accordance with the provisions of the Article, and he always indicated that he understood those rights. He presented no evidence to the contrary. Even if the agent did not fully appreciate the meaning of Article 31, the evidence shows compellingly that the accused did. United States v Molette, 3 USCMA 674, 14 CMR 92. In fact, he so completely understood his rights that he refused to make any statement for several days. The latter circumstance is seized upon by the accused as evidence of involuntariness sufficient to raise an issue. This contention presents an unusual situation.

A confession is not necessarily involuntary because it is given in response to questioning by law enforcement agents. United States v Welch, 1 USCMA 402, 3 CMR 136. Neither is it involuntary because made while the accused is in confinement. United States v Moore, 4 USCMA 482, 16 CMR 56. Whether continued questioning of the accused over a long period of time in conjunction with confinement without the preferment of charges is sufficient to justify exclusion of a confession obtained during that period need not concern us. See Articles 10 and 33, Uniform Code of Military Justice, 10 USC §§ 810 and 833. Cf. Mallory v United States, 354 US 449, 1 L ed 2d 1479, 77 S Ct 356 (1957). Such circumstances can raise a question as to the voluntariness of the confession. We can assume that the number of days and the time of the day during which the accused was questioned coupled with the conditions of his confinement would have, in the absence of other evidence, been sufficient to raise an issue of involuntar-

357

iness in this case. But there is other evidence.

Defense counsel requested an out-of-court hearing on the voluntariness of the accused's confession. The law officer pointed out that there might be issues of fact which should be decided by the court-martial. A colloquy followed.

"DC: Well, sir, as far as depriving the court of their prerogatives of passing on issues of fact, if the result of the out-of-court conference regarding the voluntary nature of the statements were such that you would overrule that contention, the Government would then be compelled to offer evidence to show to the court, and then they would get the facts.

"LO: Do you mean that you would then have to go through it again in open court, is that the way you see it?

"DC: There is a likelihood, yes, sir.

"TC: It would have to.

"DC: Of course, the defense counsel would then have to make a decision as to whether or not he wanted to take the risk of letting the court hear this evidence.

"LO: The evidence which the defense would present?

"DC: Yes, sir. To put it very simply, sir, connected with this case was an investigation involving sodomy."

The accused then took the stand. He testified that he had been questioned by the Criminal Investigations Detachment agents about alleged homosexual acts with another soldier. He admitted that he had such connections, but then retracted the statement. His testimony continues as follows:

"A. . . . At that time, they said 'Regardless, if you retract it or not, we can still convict you of it,' and I said, 'How?' They told me that if this was brought into court, that each one of them would take the stand and then say what—that I said I had relationships with Sergeant Boosey and that I would be convicted on it; but they said if you made a statement about the mail that this would not be pushed; those were the exact words.

"Q. What did they mean by 'this would not be pushed'?

A. They meant the sodomy.

"Q. The sodomy?

A. That is right.

"Q. So, in other words, they told you that if you made a statement about the mail, that the sodomy would not be pushed, is that correct?

A. That is right.

"Q. Were you told that more than once?

A. Yes, I was told that about two or three times by both of them."

Despite the purported assurances he received, the accused did not at the time of the sodomy conversation say anything about the "mail" offenses. Several days later, he talked to one of the agents and gave him the controverted confession. Before he did so, however he purportedly raised the sodomy issue again. His testimony is as follows:

"Q. At the time you finally made your oral and written statements was anything said to you then to the effect that if you make this statement about the mail robbery, the sodomy would be dropped?

A. When I was giving this written statement, I did ask about this sodomy; I said, 'This won't be brought up, would it?' and he said, 'No,' so then I made my written statement."

The explanation for his concern about the sodomy matter appears in the accused's testimony.

"Questions by the defense (IC):

"Q. Did anyone of the investigators say anything to you about your Mother or your family with regard to sodomy?

A. Yes, sir.

"Q. Who and when?

A. Well, it was the same night that they talked to me about that sodomy; it was that late evening, and they remarked to me, 'We know that you have a civilian record,' is what they told me, and 'Don't you think that you have caused your Mother enough grief now, and that if she ever did hear anything about this here, that

it would probably kill her.'

"Q. What do you mean by 'this here'?

A. The sodomy.

. . . . .

*"Questions by the prosecution:*

"Q. Well, can you explain why it took you all that time to become afraid that your Mother would find out and decided to tell the story?

A. Well, I kept thinking about it, and I kept thinking what would happen if she did know about it—at first, I was thinking, well, they would never tell her, and then, I was getting unsure; I did not know; I don't know if they would or not; and it started to worry me.

"Q. But you took two or three days to think it over, is that correct?

A. To think over if I would make the statement or what?

"Q. Yes?

A. Well, I thought that if I waited any longer, that they might charge me with the sodomy.

. . . . .

"Q. But you had no hesitancy about making a statement about the robbery if it would prevent your Mother from knowing about the sodomy?

A. That was because I thought if she knew something like that—it's, I don't know, it's—just don't—

"Q. I want you to explain to us what you do mean, because I would like to know why you were so concerned with your Mother's not knowing about the sodomy, and yet, you weren't particularly interested in whether or not she knew about the robbery?

A. Well, I thought—the sodomy, to me is pretty filthy actually, and, well, I thought that if my Mother would take the same attitude toward it, it would—

"Q. Don't you think that breaking into a building at night and stealing from that building is pretty dirty, too, pretty filthy?

A. But not as filthy as sodomy."

Testifying for the prosecution, the Criminal Investigations Detachment agents denied making the statement attributed to them by the accused. No issue was made as to the effect of the tensions generated in the accused's mind by the agents' questioning or by his confinement. On the contrary, the tenor of the accused's explanation eliminates that possibility. He purportedly made the confession because he was promised that the sodomy charge would not be pressed, and, consequently, his mother would not learn of that "filthy" offense. The only pressure that operated on him was his own "thought that if I waited any longer . . . they might charge me with the sodomy." Hence, the only issue on the voluntariness of the accused's confession was with regard to whether it was induced by an improper promise of nonprosecution of another offense. There was no question of coercion or force either direct or implied through the pressure of prolonged questioning and prolonged confinement. See United States v Smith, 3 USCMA 680, 14 CMR 98.

A confession obtained by an improper inducement is involuntary and inadmissible. Cf. United States v Cudd, 6 USCMA 630, 20 CMR 346. A promise to withhold prosecution of other known offenses can amount to an improper inducement. Consequently, the question of the voluntariness of the accused's confession was reasonably raised. But it was raised only in the out-of-court hearing. We are thus presented with a novel situation. Taken as a whole, the testimony on the issue raises only one question, namely, improper inducement. When split into two parts and considered separately, it can be said to raise also an issue as to coercion. Under the circumstances of this case, however, we cannot allow such fragmentation of the evidence.

Ordinarily, all evidence concerning a particular issue should be considered as a whole to determine its legal effect. United States v Redenius, 4 USCMA 161, 15 CMR 161. It is, of course, possible to raise several objections to the admissibility of a confession. Some of the grounds may be presented to the law officer in an out-of-court hearing, and others may be presented to the court members. The division may be founded upon the accused's desire to keep evi-

dence material to the issue of voluntariness, but of possible disadvantage to him, away from the court members. However, that situation is not before us. The accused made out a single issue on the voluntariness of his confession, and all the evidence on that issue must be considered as an entity. Over the hesitancy of the law officer, defense counsel insisted on presenting the evidence in an out-of-court hearing. Had he not again tendered the issue to the court-martial, he could not on appeal maintain that he had been deprived of his right to have the court members pass on the voluntariness of his confession. United States v Cooper, 2 USCMA 333, 8 CMR 133. The accused did not do that. Instead, he presented some of the evidence on the matter in open court. But he did not offer the really significant part of the evidence because he believed that it might be harmful to him. He now desires to convert his own maneuver to avoid harm into prejudicial error. This we cannot permit.

The inescapable fact is that the issue of the voluntariness of the confession was made before the law officer and not the court-martial. Consequently, no instruction to the court-martial on that point was required. United States v Davis, 2 USCMA 505, 10 CMR 3. And if no instruction was required, the accused could not have been harmed by any inaccuracy in the one that was given.

The accused's final claim of error is that the law officer erred in his instructions on the maximum sentence that could legally be imposed. He contends that the instruction is erroneous because he cannot be separately punished for Charge II and the Additional Charge.

Charge II alleges that the accused and Mennine, acting jointly, stole $397.00, property of the Unit Mail Custodian, in violation of Article 121, Uniform Code of Military Justice, 10 USC § 921. The Additional Charge alleges that they stole nine letters addressed to named persons while these letters were in the Unit Mail Room and before they were delivered to the proper addressees,

in violation of Article 134, Uniform Code, 10 USC § 934. The evidence shows that the money is the aggregate amount that was enclosed in a batch of letters stolen from the mailbox in the Unit Mail Room.

The Government contends that the general elements of the one offense are separate from those of the other. Specifically, it maintains that larceny requires proof of ownership in another and an intent permanently to deprive the owner of his property, whereas these "essential ingredients" are not necessary to sustain a charge of theft under the Federal mail statutes. 18 USC §§ 1702, 1708. See Thompson v United States, 202 Fed 401 (CA9th Cir) (1913); United States v Trosper, 127 Fed 476 (SD Cal) (1904). The Additional Charge does not allege a violation of a designated Federal statute. Although the omission may not necessarily mean that the allegation is insufficient to show a violation of a Federal statute (see United States v Long, 2 USCMA 60, 6 CMR 60), it can indicate an intention on the part of the pleader to charge the military version of the mail offense, which is "distinct" from the Federal statutes. United States v Lorenzen, 6 USCMA 512, 20 CMR 228. On that basis, a charge of stealing mail may equate to larceny under Article 121. See United States v White, 2 USCMA 439, 9 CMR 69; United States v Smith, 10 CMR 262, reversed on other grounds, 4 USCMA 369, 15 CMR 369. For the purpose of this case, we can assume that the military mail offense is the substantial equivalent of the Federal mail offense. We can also accept, for the purpose of this case, the difference between the mail offense and the general larceny statute which was noted by the Court of Appeals for the 8th Circuit. In Bowers v United States, 148 Fed 379 (1906), that court said:

"... The statute creating and defining the offense of which Bowers was charged and convicted was designed to preserve the sanctity of the mails, not merely to punish the theft of another's property."

However, a difference of purpose be-

tween two statutes does not mean that a single act in violation of both is separately punishable. It can mean simply that one value in our society merits more or less protection than another in regard to the same kind of wrongful act. As applied to the situation in this case, it means only that to protect the mails, Congress required less of a showing of an unauthorized assumption of control by an interloper than it required for other kinds of property. United States v Trosper, supra. Yet, if the interference is accompanied by other elements, it can constitute the ordinary garden variety of larceny. In the Trosper case, one of the most frequently cited on the meaning of the Federal mail statute, the court said:

". . . the section was designed solely to protect the mails, and that, while it includes larceny as understood at common law, it is not restricted to that offense, but makes criminal any unauthorized abstraction from the mails of postal matter."

Therefore, to say that the mail offense can be proved by evidence which would not be sufficient to prove larceny, does not separate the offenses so as to make them separately punishable. On the contrary, the Trosper case points out that an interference with the mail can be of such a nature as to constitute larceny at common law. What happens in such a case?

It is the general civilian rule that when several articles belonging to different persons are stolen at the same time and place there is but one larceny. That rule is followed in the military. United States v Taylor, 6 USCMA 289, 20 CMR 5; United States v Florence, 1 USCMA 620, 5 CMR 48; Manual for Courts-Martial, United States, 1951, paragraph 200a(7). The evidence shows, and the pleader recognized, that there was only a single larceny of all the letters. Cf. Ebeling v Morgan, 237 US 625, 35 S Ct 710, 59 L ed 1151 (1915). It is also the general rule that only a single theft is committed when the thief takes one article which contains other articles within it,

as in the case of a purse containing a wallet, which in turn contains a sum of money. People v Quiel, 68 Cal App2d 674, 157 P2d 446; see also United States v Florence, supra. However, in construing the Federal mail statutes at least one Federal court has, without discussion, disregarded the general rule and held that the theft of mail and the abstraction of the contents constitute two offenses which are separately punishable. Kinsella v Looney, 217 F2d 445 (CA10th Cir) (1954). Some boards of review have also disregarded the general rule and held that an accused can be punished for both the theft of a letter and the theft of its contents. United States v Albright [ACM 8157], 14 CMR 883; United States v Peoples [ACM 12237], 22 CMR 772, affirmed on other grounds, 7 USCMA 534, 22 CMR 324. Without attempting to define the differences in the provisions of the Federal statute before the court in the Looney case and the provisions of the Articles of the Uniform Code which were before the boards of review, we take a different view of the problem.

In Goode v United States, 159 US 663, 40 L ed 297, 16 S Ct 136 (1895), the United States Supreme Court pointed out that the discovery of the contents of a letter taken from the mails upon the person of a postal employee "affords almost conclusive evidence of the theft of the letter in which they are inclosed." Possession of the contents of a letter taken from a postal employee before delivery justifies a similar conclusion. In other words, proof of the theft of the contents is sufficient to establish proof of the theft of the letter in which they were contained. When such similarity of proof exists in regard to a single act committed by the accused, the offenses are not separately punishable. United States v Brown, 8 USCMA 18, 23 CMR 242. Consequently, the law officer erred in instructing the court on the maximum sentence.

The decision of the board of review as to the sentence is reversed. The record of trial is returned to The Judge Advocate General of the Army for submission to the board of review for reconsideration of the sentence.

**361**

Judge FERGUSON concurs.

LATIMER, Judge (dissenting):

I dissent.

In this instance I will limit my comments to that portion of the opinion which deals with multiplicity. The problem brought into issue is whether a conviction for larceny of money extracted from letters contrary to Article 121 of the Uniform Code and a finding of guilt for violating Article 134 by taking and destroying the letters in violation of a Federal statute, and the sentence imposed pursuant thereto, are multiplicious. First, it appears from Specifications 151 and 152, Appendix 6c, Manual for Courts-Martial, United States, 1951, and the Table of Maximum Punishments that the violation of Article 134 herein pleaded and proved consists of taking, opening, and interfering with mail matter in custody of the Government. The larceny of the money is defined, proscribed, and punished under a separate and distinct Article.

I thought we had laid the foundation for the disposition of this issue in United States v Lorenzen, 6 USCMA 512, 20 CMR 228, but in this instance the Court pays little heed to what we there said. I quote from page 514:

". . . This language is plain and unequivocal and, when considered together with provisions of similar tenor found in the 1949 Manual for Courts-Martial, is persuasive evidence that military authorities have, at least since then, regarded interference with the mail to be the very essence of the offense sought to be charged in this case. The Staff Judge Advocate seemed to recognize this, for in his review he said: 'The gravamen of the offense charged in the instant case is tampering with mail matter.'

"When we turn to relevant military case holdings, we find that our views are not without precedent. In United States v Smith, 10 CMR 262, reversed on other grounds, 4 USCMA 369, 15 CMR 369, the accused was charged with stealing a package, addressed to another, before the package was delivered. Admittedly, the specification was sufficient to allege a larceny, but as to the precise offense involved here, it was held by the board of review:

'But there is an additional element in the crime of larceny of mail matter; that is that the thing stolen is *mail matter.* . . .'"

It would appear from the statements quoted that we considered that the Article 134 offense had to involve mail matter, and in United States v Peoples, 7 USCMA 534, 22 CMR 324, we seem to have followed that rule. There we were confronted with a factual situation similar to the present one before us. In that instance, the accused raised the issue of multiplicity both at trial, before the board of review, and in a petition before this Court. The board of review discussed and decided that there was no multiplicity involved. We, however, refused to consider the alleged error of sufficient importance to include it within our grant of review.

I do not propose to question the rationale of the decisions cited by the Court in support of its holding, for they are not in point. It is true that the general civilian rule states that when several articles belonging to different persons are stolen at the same time and place, there is but one larceny. Just how that can be used as authority to support a holding that interference with the mail is the same offense as larceny is indeed a mystery to me. Also, I find some difficulty in construing the rule set forth in People v Quiel, 68 Cal App 2d 674, 157 P2d 446, to be contrary to my position. Certainly if one steals a purse containing cash, each individual coin does not form the base for a separate offense. In that case, a single taking does not offend against two separate norms of society, there are not two different punitive Articles which are violated, and the elements of the two asserted offenses are not different.

Goode v United States, 159 US 663, 16 S Ct 136, 40 L ed 297, is hardly worth analyzing, as the special statute in that case specifically requires the taking of something of value from the letter. Furthermore, it is cited for the propo-

362

sition that possession of property enclosed in a letter to a third party is almost conclusive evidence of the theft of the letter. That holding merely touches on the principle of possession of recently stolen property which has to do with the sufficiency of the evidence. Nowhere do I find any mention made of multiplicity although the defendant was found guilty on three counts of embezzlement and four counts of theft of mail and only one transaction is discussed.

For cases more closely in point, I cite Kinsella v Looney, 217 F2d 445 (CA10th Cir) (1954) which holds that counts of an indictment charging theft of a letter from a house letter box and unlawful removal of the contents from such letter are separate and distinct offenses. Analogously it has been held that larceny of Government property belonging to the Post Office Department and larceny of mail matter following a burglarious entry are distinct offenses even though both offenses form part of one transaction. In re Snow, 147 F2d 1006 (CA9th Cir) (1945). Finally, it was held in Adams v White, 31 F2d 982 (CA8th Cir) (1929), that burglary and stealing postal funds are separate offenses. In the three cases cited immediately above the penalties imposed for both offenses were affirmed on appeal.

It should be obvious to even a casual reader that each offense which presently concerns us, namely, larceny from the mail and larceny from an individual addressee, requires proof of an element not necessary to prove the other. The violation of Article 134 requires proof of some act which offends against the sanctity of the mails; see Bowers v United States, 148 Fed 379 (CA8th Cir) (1906); United States v Falkenhainer, 21 Fed 624 (ED Mo) (1884); and the theft of a letter in transit will suffice for that purpose. Larceny in violation of Article 121 is an offense against the personal property of a third party and an essential element thereof is the taking of something of value with intent to deprive the true owner permanently of its possession. The first mentioned offense does not require proof of either value or intent to deprive and the last enumerated crime has nothing to do with interfering with communications placed in mail channels.

Pursuant to the rule recognized by most civilian courts, I find the offenses separate and on that basis I would affirm the board of review.