# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
SCHENCK, HOLDEN, and WALBURN
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Staff Sergeant JOHN M. DIAMOND**
**United States Army, Appellant**

ARMY 20010761

82d Airborne Division and Fort Bragg
Patrick J. Parrish, Military Judge
Lieutenant Colonel W. Renn Gade, Staff Judge Advocate (trial and recommendation)
Lieutenant Colonel Thomas E. Ayers, Staff Judge Advocate (addendum)

For Appellant:  Captain Julie Caruso, JA; Donald G. Rehkopf, Jr. Esquire (on brief); Colonel Mark Cremin, JA; Lieutenant Colonel Mark Tellitocci, JA; Captain Charlie A. Kuhfahl, JA; Major Sean S. Park, JA; Captain Jeremy W. Robinson, JA.

For Appellee:  Lieutenant Colonel Theresa A. Gallagher, JA; Captain Edward E. Wiggers, JA; Captain Michael C. Friess, JA (on brief); Colonel Steven T. Salata, JA; Lieutenant Colonel Mark L. Johnson, JA; Major Natalie A. Kolb, JA.

21 December 2007

------------------------------------
OPINION OF THE COURT
------------------------------------

SCHENCK, Senior Judge:

A military judge sitting as a general court-martial convicted appellant, in accordance with his pleas, of violating a lawful general regulation by wrongfully transporting and storing a privately-owned weapon in his vehicle and committing adultery on divers occasions, in violation of Articles 92 and 134, Uniform Code of Military Justice, 10 U.S.C. § 892 and 934 [hereinafter UCMJ].  A general court-martial composed of officer and enlisted members convicted appellant, contrary to his pleas, of conspiring to commit premeditated murder, premeditated murder, and obstructing justice, in violation of Articles 81, 118, and 134, UCMJ.  The convening

DIAMOND – ARMY 20010761

authority approved the adjudged sentence to a dishonorable discharge, confinement for life without the possibility of parole,[1] forfeiture of all pay and allowances, and reduction to Private E1. This case is before the court for review pursuant to Article 66, UCMJ.

Appellant asserts a number of errors on appeal. None have merit, but one warrants discussion — appellant's contention the military judge erred by admitting Doctor (Dr.) Michelle Theer's statements as a co-conspirator pursuant to Military Rule of Evidence [hereinafter Mil. R. Evid.] 801(d)(2)(E).[2] Essentially, appellate defense counsel assert, *inter alia*, appellant was only charged with *conspiracy to commit the premeditated murder* of Air Force Captain (Capt.) Frank M. Theer, and the military judge committed plain error when he admitted statements that were not made "in furtherance" of the charged conspiracy, but rather, to prove the *uncharged* misconduct of *conspiracy to obstruct justice*. Moreover, appellant asserts these statements were admitted in violation of the Confrontation Clause of the Sixth Amendment to the U.S. Constitution.

---

[1] The military judge awarded appellant 192 days confinement credit against the sentence to confinement. The convening authority's initial action and promulgating order failed to reflect the credit. *See* Rule for Courts-Martial 1107(f)(4)(F); Army Reg. 27-10, Legal Services: Military Justice, para. 5-31a (24 Jun. 1996) (requiring a convening authority to "show in [the] initial action all credits against a sentence to confinement . . . regardless of the source of the credit . . . or for any . . . reason specified by the judge"); *United States v. Delvalle*, 55 M.J. 648, 649 n.1, 656 (Army Ct. Crim. App. 2001); *United States v. Arab*, 55 M.J. 508, 510 n.2, 520 (Army Ct. Crim. App. 2001). Accordingly, to the extent appellant has not already received this credit, appellant will be credited with 192 days of confinement credit.

[2] We find appellant's corresponding assertion that the military judge also failed to sua sponte "give the appropriately tailored 'uncharged misconduct' instructions" to be without merit. The parties at trial discussed the possibility of an uncharged conspiracy to obstruct justice, but the defense did not request any corresponding "appropriately tailored uncharged misconduct instructions." We find the military judge did not abuse his discretion by failing to sua sponte provide such a limiting instruction. We do not have "'a definite and firm conviction that the [military judge] committed a clear error of judgment in the conclusion [he] reached upon a weighing of the relevant facts.'" *United States v. Dacosta*, 63 M.J. 575, 579 (Army Ct. Crim. App. 2006) (quoting *United States v. Houser*, 36 M.J. 392, 397 (C.M.A. 1993) (first alteration in original)).

DIAMOND – ARMY 20010761

    We hold the military judge did not err and find the admission of the statements did not violate the Confrontation Clause. In doing so, we necessarily address the responsibilities of the military judge when dealing with uncharged misconduct evidence as it relates to evidence offered to prove a conspiracy.

## FACTS

    An enlisted panel convicted appellant of premeditated murder and conspiracy to commit the premeditated murder of his paramour's husband, Capt. Theer. The panel also convicted appellant of obstructing justice on or about 12 February 2001 by disposing a Smith and Wesson 9mm pistol. Appellant pleaded guilty to adultery for numerous acts of sexual intercourse with Dr. Theer from February 2000 to February 2001.[3] With appellant's authorization, the panel was informed of appellant's guilty plea to the adultery and Article 92, UCMJ, violations. The members also were given a document (flyer) listing these offenses.

### The Murder

    Doctor Theer, a practicing psychologist, found her husband's body on Sunday night, 17 December 2000, at the base of the stairwell outside the office building where she worked in Fayetteville, North Carolina. Earlier in the evening, Dr. and Capt. Theer attended her office holiday dinner party at The Fox and The Hound restaurant in Fayetteville. Doctor Harbin, Dr. Theer's colleague, had invited Capt. Theer after Dr. Theer told Dr. Harbin that her husband was upset about not being invited to the dinner party. Prior to dinner, Capt. and Dr. Theer left their vehicle in the office parking lot and rode with another of Dr. Theer's colleagues, Ms. HM and Ms. HM's boyfriend to the restaurant. After dinner, Ms. HM, her boyfriend, and the Theers returned to the office parking lot at approximately 2230. The Theers drove to a nearby gas station but then returned to the office because Dr. Theer said she wanted to retrieve some work. While Dr. Theer went up the exterior stairs to her office on the second floor, Capt. Theer waited in the parking lot. From inside the office, Dr. Theer heard shots and ran to see her husband, dead at the bottom of the exterior stairs leading to her office.[4]

    Rather than call for help from her cell phone, Dr. Theer ran to a nearby video rental store and told the clerk to call 911 because her husband had been shot. After

_____
[3] At trial, the defense also conceded that appellant and Dr. Theer continued to see each other after Capt. Theer's murder.

[4] At trial one witness testified he heard four or five "deliberate" shots fired.

phoning 911 from the video store, Dr. Theer and another store patron returned to Capt. Theer. Captain Theer was shot four times with a 9mm pistol from more than two feet away, one bullet went through the back of his left upper leg and left forearm. The other two bullets lodged in his abdomen. He was also shot once in the head at a range of four to six inches. A bullet hole was found in the door frame above the office door at the top of the stairs and some sequins from Capt. Theer's holiday suspenders were also found at the top of the stairs.

*The Relationship Between Appellant and Dr. Theer*

Appellant and his wife, Mrs. Lourdes Diamond, met in Panama and married in 1996. In 2000 they experienced some marital difficulties resulting in appellant leaving her in February 2000 to live with "a friend." He moved back in with his wife sometime between September and October 2000, only to leave her again in January 2001.

In March 2000, appellant met Dr. Theer on the internet when he answered her personal internet advertisement. Appellant and Dr. Theer engaged in an extramarital affair from March 2000 until February 2001. In the fall of 2000, appellant informed his psychology classmates that his fiancée was a psychologist. Later a friend met Dr. Theer at appellant's apartment. Additionally, appellant listed his "girlfriend" as his emergency contact on the unit alert rosters in September 2000. The phone number listed for the unnamed "girlfriend" was Dr. Theer's cell phone number.

Moreover, in September 2000, Dr. Theer applied for a faculty position scheduled to be filled in June 2001 at the Saba University Medical School, located on Saba Island in the Caribbean. In the letter accompanying her application, Dr. Theer indicated she was twenty-nine years old, single, with no children, and would be traveling with her fiancé, "John." Appellant and Dr. Theer traveled to Saba Island on 18 October 2000, two months before the murder. While there, they had dinner with the Saba Medical University administrator who testified Dr. Theer introduced appellant as her fiancé and that after he told the couple about his prior position as a prosecutor in California for fourteen years, appellant became noticeably quiet. Prior to the trip to Saba Island, appellant sent email messages to the owner of a scuba diving shop indicating he was a dive master moving to the island with his wife and was interested in possible employment. While on the island, appellant left the dive shop owner a note stating: "This is John Diamond, I emailed about the possibility of working here. I am a current dive master. . . . It looks like me, and my wife will be relocating here in Feb[ruary 2001] for approx[imately] 3 y[ears]. Email me later."

During the murder investigation, Dr. Harbin told police Dr. Theer had confided to him in November 2000 that she was having an affair with "someone named John" starting in early October 2000 and ending in mid-November 2000.

4

Doctor Theer told Dr. Harbin she was having marital problems due to a disagreement regarding whether to have children and her belief her husband was having an extramarital affair. Doctor Theer moved out of her home and into an apartment sometime between the summer and fall of 2000. She told Dr. Harbin she was undecided whether to get a divorce because she wanted her husband's signing bonus for extending his active duty service obligation. She moved back in with her husband during the fall of 2000. Doctor Theer was the beneficiary of her husband's $500,000.00 life insurance policy. The Theers applied for the policy on 15 September 1999. The company never paid the claim on the policy following the murder, however, because the company could not complete its investigation.

Appellant and Dr. Theer continued their relationship after the murder. Doctor Theer told police she saw appellant on 20 December 2000 because she "wanted to look in his eyes and asked [sic] him did he have any involvement in the death of her husband and she would know by looking at him, so she called him." When she asked appellant he said, "no" and "he showed remorse for her and her situation and said that he didn't have any involvement." Doctor Theer also told police she did not think appellant was involved. Their relationship continued even after appellant was in pretrial confinement on 21 February 2001. During the last week of February 2001, appellant placed over 300 calls to Dr. Theer and listed her as the "family shrink" on his visitor request list at the confinement facility in March 2001.

*The Murder Investigation*

Doctor Harbin testified Dr. Theer told him she called appellant from The Fox and The Hound prior to leaving the restaurant on the night of the murder. During the murder investigation, Dr. Theer gave him the impression she thought the investigators were incompetent and were spending too much time investigating her and appellant. Doctor Harbin reminded her that her telephone call to appellant from the restaurant did make her "look bad" and encouraged Dr. Theer to be less antagonistic and cooperate with investigators.

When interviewed on 19 December 2000 regarding the murder, appellant told Fayetteville Police Investigator Clinkscales he spent one night of the weekend prior to the murder with Dr. Theer to celebrate her birthday; he admitted they had sexual intercourse. Appellant also told police he saw Dr. Theer the evening before the murder at a restaurant, but claimed he was at home with his wife watching television on the night of the murder. Appellant said he did not own a weapon, but he also said that after ten years of military experience he was a trained sniper and could produce a "close shot group." In the afternoon on the day of the murder, appellant twice called a pawn shop in Fayetteville to determine its store hours for the next day and to obtain information whether he could rent and test fire a handgun at the store. The

morning after the murder, appellant went to the pawn shop and fired a Beretta 9mm pistol, a weapon similar to the weapon used to kill Capt. Theer. As a result, Investigator Clinkscales determined that testing appellant for gun shot residue (GSR) would not provide any useful evidence regarding Capt. Theer's murder. Appellant asked Investigator Clinkscales not to tell his wife about his relationship with Dr. Theer.

Mrs. Diamond testified that the night of the murder appellant arrived at home sometime between 1900 and 2000 and they began watching a rented movie after 2000. Upon receiving a call on his cell phone in the middle of the movie, appellant left the room, changed his clothes, and told her he was going to the base. Mrs. Diamond and her mother continued to watch the "long" movie before Mrs. Diamond went to bed "real late." Appellant had not returned. Appellant's mother-in-law, who had moved in with the Diamonds in November 2000, testified similarly, but said she woke up when appellant returned during the night. She heard the door and the sound of appellant walking from the door to the kitchen. She also heard "the clothes washer come on later[.]" When Mrs. Diamond awoke the next morning, appellant was asleep in the baby's room. Appellant told her he had gone to the barracks the previous night and did not remember what time he had returned. He ate breakfast with his wife and then left.

Fayetteville Police called Mrs. Diamond on Tuesday, 19 December 2000, and scheduled an interview. Prior to the interview, appellant told Mrs. Diamond to "remember that we were watching movies" and "that night we had had sexual relations." She told appellant that was not true; they did not have sex and he had left after receiving a phone call. Appellant insisted she remember they rented movies and told her to call him after the interview. Fayetteville police interviewed Mrs. Diamond four times, the last interview with agents from the Army Criminal Investigation Command (CID). Mrs. Diamond told them appellant was in her house, watched movies all night, and never left. She told her mother to tell the police the same story. Afraid Mrs. Diamond would lose custody of her baby and they might be deported, however, Mrs. Diamond and her mother subsequently told the police the truth in February 2001, when they discovered the police were investigating a murder.

*Disposal of the 9mm Smith and Wesson Pistol*

Just prior to the murder, appellant borrowed a 9mm Smith and Wesson pistol from Staff Sergeant (SSG) Peyton Donald. Staff Sergeant Donald and appellant were stationed together in Panama until appellant went to work for the CID. Appellant told SSG Donald he wanted to fire the weapon on the range. After the murder, and two days prior to returning the weapon, appellant called SSG Donald and asked him if he had received the Fayetteville newspaper. Since SSG Donald did not have the newspaper, appellant told him to search for "Theer" on the internet. This search

resulted in an article regarding Capt. Theer's murder. Appellant explained that the victim was Dr. Theer's husband. Staff Sergeant Donald knew Dr. Theer because he and his wife had previously gone out to dinner with Dr. Theer and appellant during the summer of 2000. At the end of January or beginning of February 2001, appellant asked SSG Donald to sell him the 9mm pistol. Unable to buy the weapon from SSG Donald, appellant borrowed it again.

The CID contacted SSG Donald in February 2001, asked him about the 9mm pistol, and requested he call appellant about the weapon since appellant still had it in his possession. Staff Sergeant Donald called appellant on 12 February 2001. Initially, appellant said he no longer had the pistol and did not know where the weapon was. Appellant then called SSG Donald back and offered to retrieve the pistol. Later that night, appellant called SSG Donald again and told SSG Donald someone had broken into his vehicle. Appellant subsequently called SSG Donald to obtain information about the pistol so he could report it stolen along with the damage to his car to the military police.

At 2225 on 12 February 2001, appellant provided military police a sworn statement claiming on 8 February 2001 he parked his car in the very last spot of an on-post parking lot. He further stated his car was parked near the woods in a poorly lit area at the farthest point from any buildings. According to appellant, when he returned from a weekend trip on 12 February 2001, he found someone had broken into the car and stolen SSG Donald's weapon. Although the Diamonds' divorce was final on 24 January 2001, appellant nevertheless also called his former wife on 12 February 2001 to use her new address for the military police report.

After military police questioned appellant about the theft, they advised appellant he was suspected of murder and he waived his rights. Appellant told the CID agents he had a purely nonsexual friendship with Dr. Theer. After the interview, appellant called Dr. Theer to pick him up at the barracks. Appellant was not at unit physical training the following morning, 13 February 2001, and did not report for duty until 1300.[5] He told the battalion command sergeant major that he had been at the CID office.

---

[5] In allowing this testimony over defense objection based on uncharged misconduct, the military judge conducted the appropriate balancing test before admitting the evidence. *See United States v. Reynolds*, 29 M.J. 105 (C.M.A. 1989) (establishing a three-prong test to determine whether uncharged misconduct may be admitted under Mil. R. Evid. 404(b)).

Contrary to appellant's version of events, the government presented a surveillance video recorded on 12 February 2001 showing appellant and Dr. Theer with appellant's vehicle. Additionally, witnesses saw a vehicle resembling appellant's vehicle parked near Dr. Theer's house during this time period. Moreover, Dr. Theer's classmate from graduate school also testified that Dr. Theer and appellant drove to Florida and visited her from 8 until 12 February 2001. According to the classmate, they did not drive any of Dr. Theer's vehicles. During this trip Dr. Theer also dropped off appellant to visit his younger sister. Appellant's brother-in-law later took appellant to meet someone fitting Dr. Theer's description driving a vehicle similar to appellant's.

*Trial*

At trial, Dr. Theer, as an alleged co-conspirator, invoked her Fifth Amendment right to remain silent. Appellant's defense counsel had the opportunity to cross-examine Dr. Theer to the extent she responded to questions. In discussing her unavailability as a witness, the following colloquy transpired:

> CDC: Clearly [Dr. Theer] has invoked, clearly she would not be available . . . .
>
> MJ: I'm not ruling on whether or not any evidence is admissible under 804, but I'm just ruling on whether or not she's available and that she has invoked.
>
> CDC: I think to, after this display in the courtroom to argue otherwise would be intellectually dishonest and I would not do that, Your Honor.
>
> MJ: I find that [Dr.] Theer, based on her invocation is unavailable with regards to the subject areas that she invoked in. That's not to say that she is unavailable for anything that might come up but she is unavailable for the subject matters to which she has been asked questions and invoked. Now, whether or not that then makes any other statements admissible under 804 is for a different day to decide based on additional evidence the government may have. . . .

Accordingly, the military judge found Dr. Theer "unavailable" for purposes of Mil. R. Evid. 804.

The government then moved to admit several statements Dr. Theer made before and after Capt. Theer's murder to police officers Investigator Clinkscales and Sergeant Mitrisin as well as to her colleague, Dr. Harbin, and appellant's friend, SSG Donald. The government also sought to admit a ten-page memorandum dated 27 January 2001 retrieved from Dr. Theer's personal laptop computer.

*Statements to Police Officers*

On 18 December 2000, Dr. Theer admitted her extramarital affair with appellant in a statement to police. She claimed she ended the affair in the fall of 2000, when her husband returned from a temporary duty assignment. On 21 December 2000, Dr. Theer further claimed she had no contact with appellant the day before the murder. This contradicted appellant's admission to the police that he went to a restaurant with Dr. Theer on 16 December 2000. Doctor Theer eventually admitted to the 16 December meeting with appellant and that she talked to appellant at 1600 the day of the murder. After the police told Dr. Theer they could retrieve her cell phone records, she further admitted to calling appellant from the restaurant restroom prior to departing, but asserted appellant did not answer the call. The other members of the dinner party also testified Dr. Theer went to the restroom immediately before they departed the restaurant.

In January 2001, Dr. Theer asked Investigator Clinkscales if appellant "had an alibi" and if the police had conducted "a GSR test on him." The military judge found these questions "not assertions, [and] therefore not hearsay under [Mil. R. Evid.] 801 and . . . these questions tend to show – [go] to the element of intent on part of the co-conspirator in this case . . . . The statements are not admitted as a statement of a co-conspirator, that's not the theory upon which they are admitted. They are admitted to show the intent to prove a conspiracy because the accused is charged with a conspiracy."

*Statements to Dr. Harbin*

Doctor Theer told her colleague, Dr. Harbin, that she called appellant on her cell phone from the restaurant restroom on the night of the murder. She said she was having her car fixed and was calling to arrange a ride.

The military judge advised the government this statement "would show complicity – [a] statement by her in furtherance of a way to hide their involvement in that murder. So, if you lay a sufficient foundation to show that the conspiracy exists, well then Dr. Harbin's testimony can come in front of the members."

*Statements to SSG Donald*

Shortly after appellant's report of SSG Donald's stolen pistol on 12 February 2001, Dr. Theer called and left a message on SSG Donald's answering machine. She said she was John's friend, wanted to talk to SSG Donald, and wanted to give SSG Donald something because appellant "wasn't able to do it." Staff Sergeant Donald subsequently set up a meeting with Dr. Theer, but he said she did not show up as "she didn't feel comfortable" because the police had asked her to wear a wire and she felt they may have asked SSG Donald to wear a wire as well.

*The Memorandum*

Appellate defense counsel contend the military judge erred in entering a document (Prosecution Exhibit (PE) 148) as a co-conspirator statement, which a computer forensics specialist retrieved from Dr. Theer's laptop computer. Doctor Theer testified during a pretrial hearing regarding the defense's motion to quash a subpoena to produce the document. She said she prepared it to give to her attorney after her 27 January 2001 meeting with appellant. According to Dr. Theer, the document is a summary of an interview between Dr. Theer and appellant reflecting her questions and his responses. During this pretrial hearing, defense counsel cross-examined Dr. Theer.

With defense counsel's concurrence, portions of Dr. Theer's testimony from the pretrial hearing transcript were read to the panel during trial on the merits. The military judge told the panel, with defense counsel's concurrence, "[t]his is the testimony at another hearing that I held for Dr. Theer. You're just going to hear some testimony to lay a foundation for those documents just to put them in context." After the reading of the testimony, the military judge also told the panel, "members, you'll be getting a copy of [PE] 148 and that last . . . testimony of Michelle Theer in a prior hearing and putting it in context with [PE] 148." The military judge further explained outside the panel's presence:

> Now, with regards to [PE] 148 that has already been admitted based on the theory of — or, conversations or statements between two co-conspirators. I've already ruled that the conspiracies existed. It was done in furtherance of a conspiracy. Also, in the question and answer form, questions by [Dr.] Theer and answers by the accused and making a statement by the accused as told by [Dr.] Theer and defense did have an opportunity to cross-examine [Dr.] Theer when she testified regarding this statement.

10

DIAMOND – ARMY 20010761

## DISCUSSION

Appellant now contends (1) the admission of these statements violated his right to confrontation under the Sixth Amendment and (2) the military judge erred in admitting these various statements by Dr. Theer as those of a co-conspirator under Mil. R. Evid. 801(d)(2)(E). Because neither nontestimonial statements nor co-conspirator statements fall under the requirements articulated in *Crawford v. Washington*, 541 U.S. 36 (2004), we disagree with appellant's Sixth Amendment claims.[6] Moreover, we find the military judge did not err in admitting these statements under Mil. R. Evid. 801(d)(2)(E).

### *CONFRONTATION CLAUSE*

#### *Law*

"Although the right of confrontation and the hearsay rule stem from the same roots, they are not coextensive, and evidence admissible under a hearsay exception may still be inadmissible under the [Sixth Amendment] Confrontation Clause." *United States v. Palacios*, 32 M.J. 1047, 1051 n.5 (A.C.M.R. 1991), *rev'd*, 37 M.J. 366, 367–68 (C.M.A. 1993) (upholding lower court's finding that admission of child-victim's videotaped statement was erroneous, but finding admission not harmless beyond a reasonable doubt). *See also California v. Green*, 399 U.S. 149, 155–56 (1970) (recognizing the overlap between hearsay rules and Confrontation Clause is not complete, and stating "we have more than once found a violation of confrontation values even though the statements in issue were admitted under an arguably recognized hearsay exception").

Military Rules of Evidence prohibit admission of hearsay "except as provided by these rules or by any Act of Congress applicable in trials by court-martial." Mil. R. Evid. 802. Hearsay is further defined as an out-of-court statement offered into evidence to prove the truth of the matter asserted in the statement. Mil. R. Evid. 801(c). The Sixth Amendment's Confrontation Clause, however, bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross examination." *Crawford*, 541 U.S. at 53–54, 68.

---

[6] We also disagree with the government's assertion that because Dr. Theer's testimony was primarily exculpatory the Sixth Amendment Confrontation Clause is inapplicable. We find no support for this proposition. In any event, as the government offered these statements ostensibly to prove a conspiracy existed or some other fact relevant to the government's case, they seem inherently inculpatory.

11

DIAMOND – ARMY 20010761

In *Crawford*, the U.S. Supreme Court explained that the U.S. Constitution's Sixth Amendment Confrontation Clause "applies to 'witnesses' against the accused — in other words, those who 'bear testimony.'" *Crawford*, 541 U.S. at 51 (quoting 2 N. WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828)). Moreover, as the Court noted "testimony" is "typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" *Id.* The Confrontation Clause pertains to both a witness' in-court testimony as well as out-of-court statements of a testimonial nature. *Id.* However, the Confrontation Clause is not implicated by all out-of-court statements, since "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Id.*

A. *Crawford's Application to Non-Testimonial Statements*

Following *Crawford*, the Supreme Court emphasized that the Confrontation Clause requirements articulated in *Crawford* apply only to testimonial hearsay. *Davis v. Washington*, 547 U.S. 813, __; 126 S. Ct. 2266, 2274 (2006). As the *Davis* Court explained:

> A critical portion of this holding, and the portion central to resolution of the two cases now before us, is the phrase "testimonial statements." Only statements of this sort cause the declarant to be a "witness" within the meaning of the Confrontation Clause. *See* [*Crawford*, 541 U.S. at 51]. It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause.

*Id.* at __, 126 S. Ct. at 2273.

The initial question, then, is: whether Dr. Theer's statements are *testimonial*. The answer to this question "depends on the meaning of 'testimonial,' [as well as] on the circumstances and context in which out-of-court statements are generated, and whether the out-of-court statements were made under circumstances that would lead an objective witness reasonably to believe the statement would be available for use at a later trial by the government." *United States v. Magyari*, 63 M.J. 123, 126 (C.A.A.F. 2006) (citing *Crawford*, 541 U.S. at 52). In determining whether Dr. Theer's statements are testimonial or nontestimonial, we must consider such factors as whether each statement: (1) was "in response to a law enforcement or prosecutorial inquiry"; (2) involved "more than a routine and objective cataloging of unambiguous factual matters"; and (3) was made primarily to produce "evidence with

an eye toward trial[.]" *United States v. Rankin*, 64 M.J. 348, 352 (C.A.A.F. 2007). As our court further explained:

> The last of the *Rankin* Court's factors requires military courts to conduct a "contextual analysis" to determine "whether the primary purpose of the document [or statement] was prosecutorial in nature." [*United States v.*] *Foerster*, 65 M.J. [120,] 124. "[O]ur goal is an objective look at the totality of the circumstances surrounding the statement to determine if the statement was made or elicited to preserve past facts for a criminal trial." [*United States v.*] *Gardinier*, 65 M.J. 60, 65 (C.A.A.F. 2007).

*United States v. Williamson*, 65 M.J. 706, 716-17 (Army Ct. Crim. App. 2007) (second, third, and fifth alterations added).

*Analysis*

Doctor Theer's statements to Dr. Harbin and SSG Donald do not meet two of these three criteria. Although they may have involved more than a routine gathering of facts, they were not made to law enforcement and it is apparent Dr. Theer did not intend they be used for prosecutorial purposes. *See United States v. Scheurer*, 62 M.J. 100 (C.A.A.F. 2005) (secretly recorded statements to a co-worker are not testimonial). The memorandum retrieved from Dr. Theer's laptop computer contained a summary of conversations between her and appellant made at the behest of her attorneys for her own potential defense in this matter. Her primary purpose was not prosecutorial in nature as she never meant for this document to fall into the hands of law enforcement personnel.

Moreover, in context, it is apparent that in posing the questions Dr. Theer sought to help eliminate appellant as a suspect. Her primary purpose, therefore, was not prosecutorial in nature, but rather to obviate appellant's prosecution entirely. As for Dr Theer's statements to law enforcement regarding her affair with appellant and her call to him from the restaurant, we need not decide whether these constitute testimonial hearsay.[7] Even if we assume error, we find their admission was cumulative with admissions from appellant and testimony from other witnesses and, therefore, harmless beyond a reasonable doubt. *See United States v. Allison*, 63 M.J. 365, 370-71 (C.A.A.F. 2006) (assertions of error can be disposed of by assuming the

---

[7] We also agree with the military judge that Dr. Theer's questions to law enforcement were not assertions and do not qualify as hearsay under Mil. R. Evid. 801.

error and determining the error harmless beyond a reasonable doubt). *See also United States v. Othuru*, ___ MJ ___, 2007 CAAF LEXIS 1657 (C.A.A.F. 12 Dec. 2007) (holding Confrontation Clause violations are reviewed to determine whether they were harmless beyond a reasonable doubt.)

In addition, even if Dr. Theer's statements in question would otherwise be considered testimonial, the requirements outlined in *Crawford* do not apply to them because co-conspirator statements are, by definition, *nonhearsay*.

*B. Crawford's Application to Co-Conspirator Statements*

In *Ohio v. Roberts*, 448 U.S. 56, 66 (1980), the Supreme Court held: "[H]earsay is admissible when the witness is unavailable and the hearsay either 'falls within a firmly rooted hearsay exception,' *see*, *e.g.*, *White v. Illinois*, 502 U.S. 346, 355 (1992), or has 'particularized guarantees of trustworthiness,' *see*, *e.g.*, *Idaho v. Wright*, 497 U.S. 805, 820 (1990)." *United States v. Bridges*, 55 M.J. 60, 62–63 (C.A.A.F. 2001). The *Crawford* Court overruled the *Roberts* holding, "that an unavailable witness's out-of-court statement may be admitted so long as it has adequate indicia of reliability — *i.e.*, falls within a 'firmly rooted hearsay exception' or bears 'particularized guarantees of trustworthiness.'" *Crawford*, 541 U.S. at 42, 60 (quoting *Roberts*, 541 U.S. at 66).

However, prior to its *Crawford* decision, the Supreme Court held that co-conspirator statements made in furtherance of the conspiracy do not require the *Roberts*' showing of unavailability or an independent inquiry into the reliability of co-conspirator statements. *See Bourjaily v. United States*, 483 U.S. 171, 183-84 (1987); *United States v. Inadi*, 475 U.S. 387, 398-401 (1986); *Dutton v. Evans*, 400 U.S. 74, 87-89 (1970) (holding that state statute permitting out-of-court co-conspirator statements made during the concealment phase of a conspiracy did not violate the Confrontation Clause). The Court in *Bourjaily* held, "the *Confrontation Clause* does not require a court to embark on an independent inquiry into the reliability of statements that satisfy the requirements of Rule 801(d)(2)(E)." *Bourjaily*, 483 U.S. at 183-84.

In *Inadi*, the Court "continue[d] to affirm the validity of the use of co-conspirator statements, and . . . decline[d] to require a showing of the declarant's unavailability as a prerequisite to their admission." *Inadi*, 475 U.S. at 402. In reviewing both the Federal Rule of Evidence and the Sixth Amendment, the Court explained:

> There are good reasons why the unavailability rule, developed in cases involving former testimony, is not applicable to co-conspirators' out-of-court statements.

Unlike some other exceptions to the hearsay rules, or the exemption from the hearsay definition involved in this case, former testimony often is only a weaker substitute for live testimony. It seldom has independent evidentiary significance of its own, but is intended to replace live testimony. If the declarant is available and the same information can be presented to the trier of fact in the form of live testimony, with full cross-examination and the opportunity to view the demeanor of the declarant, there is little justification for relying on the weaker version. When two versions of the same evidence are available, longstanding principles of the law of hearsay, applicable as well to Confrontation Clause analysis, favor the better evidence. *See* GRAHAM, THE RIGHT OF CONFRONTATION AND THE HEARSAY RULE: SIR WALTER RALEIGH LOSES ANOTHER ONE, 8 CRIM. L. BULL. 99, 143 (1972). But if the declarant is unavailable, no "better" version of the evidence exists, the former testimony may be admitted as a substitute for live testimony on the same point.

Those same principles do not apply to co-conspirator statements. Because they are made while the conspiracy is in progress, such statements provide evidence of the conspiracy's context that cannot be replicated, even if the declarant testifies to the same matters in court. . . . [T]he statement often will derive its significance from the circumstances in which it was made. . . . Even when the declarant takes the stand, his in-court testimony seldom will reproduce a significant portion of the evidentiary value of his statements during the course of the conspiracy.

In addition, the relative positions of the parties will have changed substantially between the time of the statements and the trial. The declarant and the defendant will have changed from partners in an illegal conspiracy to suspects or defendants in a criminal trial, each with information potentially damaging to the other. The declarant himself may be facing indictment or trial, in which case he has little incentive to aid the prosecution, and yet will be equally wary of coming to the aid of his former partners in crime. In that situation, it is extremely unlikely that in-court testimony will recapture the evidentiary significance

15

> of statements made when the conspiracy was operating in full force.
>
> These points distinguish co-conspirators' statements from the statements involved in *Roberts* and our other prior testimony cases. Those cases rested in part on the strong similarities between the prior judicial proceedings and the trial. No such strong similarities exist between co-conspirator statements and live testimony at trial. To the contrary, co-conspirator statements derive much of their value from the fact that they are made in a context very different from trial, and therefore are usually irreplaceable as substantive evidence. Under these circumstances, "only clear folly would dictate an across-the-board policy of doing without" such statements. Advisory Committee's Introductory Note on the Hearsay Problem, quoted in Westen, The Future of Confrontation, 77 Mich. L. Rev. 1185, 1193, n. 35 (1979). The admission of co-conspirators' declarations into evidence thus actually furthers the "Confrontation Clause's very mission" which is to "advance 'the accuracy of the truth-determining process in criminal trials.'" *Tennessee* v. *Street*, 471 U.S. 409, 415 (1985), [(quoting *Dutton*, 400 U.S. at 89)].

*Id*. at 394-96.

The *Crawford* Court did not specifically overrule its decisions in *Bourjaily*, *Inadi*, and *Dutton*. Consequently, those decisions are still binding on this court. As the Supreme Court said in addressing the continued validity of precedents:

> We do not acknowledge, and we do not hold, that other courts should conclude our more recent cases have, by implication, overruled an earlier precedent. We reaffirm that "if a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."

*Agostini* v. *Felton***,** 521 U.S. 203, 237 (1997) (quoting *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989)). Following this principle, our superior court concluded that *Crawford* did not by implication overrule *Maryland v. Craig*, 497 U.S. 836 (2004). *United States v. Pack*, __ MJ __, 2007

16

DIAMOND – ARMY 20010761

CAAF LEXIS 1656 (C.A.A.F. 12 Dec. 2007).  Likewise, we find no implication the Supreme Court intended to overrule its decisions in *Bourjaily*, *Inadi*, and *Dutton*.  To the contrary, after the Supreme Court "overruled *Roberts* in *Crawford* by restoring the unavailability and cross-examination requirements," the Court continued citing the *Bourjaily* and *Dutton* decisions with approval.  *Davis*, 547 U.S. at ___ , 126 S. Ct. at 2275.

Consequently, some federal circuit courts addressing this issue post *Crawford* have concluded that co-conspirator statements admitted pursuant to Federal Rule of Evidence 801(d)(2)(E), a rule which mirrors our corresponding Mil. R. Evid., are "generally [nontestimonial] and, therefore, do not violate the Confrontation Clause as interpreted by the Supreme Court."  *United States v. Singh*, 494 F.3d 653, 658 (8th Cir. 2007).  As the Tenth Circuit aptly reasoned:

> Although the Supreme Court declined to precisely define "testimonial," the Court explicitly noted that, historically, "statements in furtherance of a conspiracy" present an "example" of "statements that by their nature [a]re not testimonial."  Moreover, the Court in *Crawford* cited *Bourjaily* with approval as one of several recent cases that "hew closely to the traditional line." . . . Because *Crawford* did not overturn *Bourjaily*, the latter continues to control our application of the Confrontation Clause to Rule 801 co-conspirator statements.

*United States v. Ramirez*, 479 F.3d 1229, 1249 (10th Cir. 2007) (internal citations and footnote omitted).

Similarly, the Seventh Circuit succinctly stated, "[a]s to the *Confrontation Clause* argument, *Crawford* does not apply.  The recordings featured the statements of co-conspirators.  These statements, by definition, are not hearsay.  *Crawford* did not change the rules as to the admissibility of co-conspirator statements."  *United States v. Jenkins*, 419 F.3d 614, 618 (7th Cir. 2005), *remanded on other grounds*, 2005 U.S. App. LEXIS 21558 (7th Cir. Ill. Sept. 30, 2005), *cert. denied Coleman v. United States*, 546 U.S. 1051 (2005).

*Analysis*

The Military Rules of Evidence, like the Federal Rules of Evidence, also place co-conspirators' statements in the category of nonhearsay.  Mil. R. Evid. 801(d)(2)(E) (stating "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy" is not hearsay).  As with the corresponding Federal Rule of Evidence, the majority of co-conspirator statements admitted

pursuant to Mil. R. Evid. 801(d)(2)(E) are inherently nontestimonial because the primary purpose for making the statement is not for later use in trial. *See United States v. Mooneyham*, 473 F.3d 280, 286 (6th Cir. 2007) (applying *Crawford* to co-conspirator statements). Similarly in appellant's case, the military judge admitted the statements of Dr. Theer at issue as "non-hearsay" co-conspirator statements or as other "non-hearsay." Because we find that *Crawford* does not apply to co-conspirator statements we find the admission of these statements did not violate the Sixth Amendment's Confrontation Clause.

Although our superior court has not addressed the specific question before us, its decision in *Pack* supports our interpretation of *Crawford*. The court addressed whether allowing a child witness to testify via closed circuit television violated the Confrontation Clause. The court distinguished *Crawford*, in part, on grounds that *Crawford* pertained only to testimonial hearsay and did not address nonhearsay in the form of video testimony. The court said: "It is important to recognize that *Crawford* did not hold that face-to-face confrontation is required in every case. Rather it held that the Confrontation Clause required cross-examination and unavailability before *testimonial hearsay* could be admitted into evidence." *Pack*, ___ MJ at ___, 2007 CAAF LEXIS 1656, slip op. at 10 (citing *Crawford*, 541 U.S. at 69) (emphasis added).

## UNCHARGED MISCONDUCT AND THE CONSPIRACY

Appellate defense counsel further contend, however, consistent with appellant's defense counsel's argument at trial, that even under the co-conspirator analysis Dr. Theer's statements should not have been admitted under Mil. R. Evid. 801(d)(2)(E) because they were not in furtherance of the "charged" conspiracy to commit the premeditated murder of Capt. Theer. Rather, they argue the government was attempting to present evidence involving an uncharged conspiracy to obstruct justice. Therefore, our analysis does not end here. We must address the application of Mil. R. Evid. 404(b) to the conspiracy involved in this case.

### Additional Facts

In addressing an objection to the admission of Dr. Theer's statements at trial, the military judge asked civilian defense counsel, "Doesn't [Mil. R. Evid.] 404(b), though, permit the government to bring out uncharged misconduct with a proper instruction to the members on how to deal with it?" Civilian defense counsel responded:

> There is some substantial question as to whether or not the
> government can bring out uncharged misconduct with
> respect to the misconduct that is a part of the charge itself

18

because ordinarily that uncharged misconduct relates to some prior or subsequent misconduct that is indicative of modus operendi, that is indicative of plan. In this case what the government is attempting to do is to allege at trial two separate conspiracies and to, in effect, ask the panel to convict on one conspiracy by proving the existence of another.

The government, however, argued that it was the co-conspirators' "preplan" for Dr. Theer to "misinform" the police and "the conspiracy didn't end with just the shooting, the conspiracy continued on through the cover up . . . until the point where [Dr. Theer] started refusing to talk to police . . . [at] the end of January." The military judge stated:

[T]he judge has to find when this conspiracy ended, when the object of the conspiracy ended, and if I find the object of the conspiracy ended at the time of the murder, then that's one thing, if I find that the actual object of the conspiracy was to commit the murder, hide it for a certain reason, then the complicity after the murder would still be in furtherance of the conspiracy. And that's all going to depend on what the evidence is.

Later in the trial during SSG Donald's testimony about the message he received from Dr. Theer regarding the 9mm pistol, the following discussion ensued:

TC: Your honor, this is going to go to the alleged but uncharged conspiracy to obstruct justice.

MJ: This will basically be evidence in furtherance of showing a conspiracy that will lay the ground work of whether or not other statements should come in?

TC: Well, these statements right here are just the conspiracy to obstruct justice.

. . . .

MJ: And so you want me to consider this when I determine whether or not that both the conspiracy to commit murder and the conspiracy to obstruct justice existed in order for you to have the members hear the statements by [Dr.] Theer?

19

> TC:  Correct, sir.
>
> CDC:  I have no objection to that basis.
>
> MJ:  Well, I will consider it for that purpose.
>
> ATC:  Sir, it's also appropriate because . . . the acts of people sort of getting together after an event . . . can be use[d] . . . as substantive evidence proved with the conspiracy.
>
> MJ:  You have not charged [SSG Diamond] with conspiracy to obstruct justice.
>
> ATC:  No, sir, but . . . the post acts can be used as evidence in a conspiracy of murder.  The people who conspire sometimes get together months later and do things to cover it up and that is admissible evidence to prove the conspiracy of murder. . . .

Prior to the final ruling on admissibility of Dr. Theer's statements as those of a co-conspirator statement, trial counsel further argued appellant and Dr. Theer engaged in a "preplan concealment plan and that part of the plan [was] for [appellant] to defeat the [GSR] test which he did by shooting the next day.  The other part — his part of this preplan was to establish an alibi which he did."  According to the government theory, the conspiracy started in September 2000, "when the plan to move out of the country was established" and ended when Dr. Theer "told police she no longer wanted to talk to them . . . near the end of January" 2001.  The government argued that Dr. Theer and appellant conspired to "obtain the profit they could gain from killing [Capt.] Theer" — the $500,000.00 of insurance money.

After extensive findings of fact, the military judge found by a preponderance of the evidence:

> [A] conspiracy existed between [Dr.] Theer and [appellant] to murder [Capt.] Theer which started in September of 2000 and a conspiracy to hide their complicity in any involvement in that murder which continued [until] the beginning of this trial . . . these statement were made while a conspiracy existed while the accused remained a part of that conspiracy in furtherance of that conspiracy.

20

In making this ruling and to determine the existence of a conspiracy, the military judge, with defense counsel's concurrence, throughout the trial, heard and considered evidence which did not come before the panel.

*Law*

A.  *Standard of Review*

We review a "'military judge's decision to admit or exclude evidence . . . under an abuse of discretion standard.'" *United States v. Barnett*, 63 M.J. 388, 394 (C.A.A.F. 2006) (quoting *United States v. McDonald*, 59 M.J. 426, 430 (C.A.A.F. 2004)).  When reviewing a mixed question of fact and law, such as the military judge's ruling on the admissibility of Dr. Theer's statements, "a military judge abuses his discretion if his findings of fact are clearly erroneous or his conclusions of law are incorrect." *United States v. Ayala*, 43 M.J. 296, 298 (C.A.A.F. 1995).  We apply a clearly-erroneous standard when reviewing a military judge's findings of fact, and a de novo standard when reviewing his conclusions of law. *United States v. Rodriguez*, 60 M.J. 239, 246 (C.A.A.F. 2004) (citing *Ayala*, 43 M.J. at 298).

When a military judge abuses his discretion, this court must test the erroneous evidentiary ruling for prejudice, and may affirm the findings of guilty if the error was harmless, i.e., did not materially prejudice appellant's substantial rights. *Barnett*, 63 M.J. at 397 (citing UCMJ art. 59(a)).  Prejudice is determined "'by weighing (1) the strength of the [g]overnment's case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question.'" *Id*. (quoting *United States v. Kerr*, 51 M.J. 401, 405 (C.A.A.F. 1999), and citing *United States v. Weeks*, 20 M.J. 22, 25 (C.M.A. 1985)).

B.  *Uncharged Misconduct*

Military Rule of Evidence 404(b) provides for limited admissibility of evidence of "other crimes, wrongs, or acts" to show "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."  Such evidence, however, may not be used to prove an accused's character and to argue he acted "in conformity therewith." *Id*.  Our superior court "has consistently held that Mil. R. Evid. 404(b) is a 'rule of inclusion.'" *United States v. Young*, 55 M.J. 193, 196 (C.A.A.F. 2001).  "The test for admissibility of evidence of uncharged crimes is 'whether the evidence of the misconduct is offered for some purpose other than to demonstrate the accused's predisposition to crime[.]'" *Id*. (quoting *United States v. Taylor*, 53 M.J. 195, 199 (C.A.A.F. 2000)).

In *Reynolds*, 29 M.J. at 109, our superior court further established a three-prong test to determine whether uncharged misconduct may be admitted under

Mil. R. Evid. 404(b).  To be admissible, the uncharged misconduct at issue must fulfill each of the following three prongs:

> 1.  Does the evidence reasonably support a finding by the court members that appellant committed prior crimes, wrongs or acts?
>
> 2.  What fact . . . of consequence is made more or less probable by the existence of this evidence?
>
> 3.  Is the probative value . . . substantially outweighed by the danger of unfair prejudice?

*Id.* (alterations in original) (internal quotations and citations omitted).  Prongs one and two test for logical relevance, while prong three tests for legal relevance. *Barnett*, 63 M.J. at 394.  "The third prong of the *Reynolds* test requires application of the balancing test under Mil. R. Evid. 403.  A military judge enjoys wide discretion under Mil. R. Evid. 403.  Where the military judge properly weighs the evidence under Mil. R. Evid. 403 and articulates the reasons for admitting the evidence, we will reverse only for a clear abuse of discretion." *Young*, 55 M.J. at 196 (internal citations omitted).  The *Reynolds* test applies to evidence of a crime, wrong, or act that precedes the charged offense as well as one that occurs after.  *Id.*

*C.  Conspiracy*

Article 81, UCMJ, provides that "[a]ny person subject to this chapter who conspires with any other person to commit an offense under this chapter shall, if one or more of the conspirators does an act to effect the object of the conspiracy, be punished as a court-martial may direct." The elements of this offense are as follows:

> (1) That the accused entered into an agreement with one or more persons to commit an offense under the code; and
>
> (2) That, while the agreement continued to exist, and while the accused remained a party to the agreement, the accused or at least one of the co-conspirators performed an overt act for the purpose of bringing about the object of the conspiracy.

*Manual for Courts-Martial, United States* (2005 ed.) [hereinafter *MCM*], Part IV, para. 5.[8]

"It is well settled that a conspiracy ends when the objectives thereof are accomplished, if not earlier by abandonment of the aims or when any of the members of the joint enterprise withdraw therefrom." *United States v. Hooper*, 4 M.J. 830, 836 (A.F.C.M.R. 1978) (citing *United States v. Beverly*, 14 U.S.C.M.A. 468, 34 C.M.R. 248 (1964); *United States v. Salisbury*, 14 U.S.C.M.A. 171, 33 C.M.R. 383 (1963); *United States v. Miasel*, 8 U.S.C.M.A. 374, 24 C.M.R. 18 (1957)). The Supreme Court further explained:

> [T]he duration of a conspiracy [cannot] be indefinitely lengthened merely because the conspiracy is kept a secret, and merely because the conspirators take steps to bury their traces, in order to avoid detection and punishment after the central criminal purpose has been accomplished. By no means does this mean that acts of concealment can never have significance in furthering a criminal conspiracy. But a vital distinction must be made between acts of concealment done in furtherance of the *main* criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained, for the purpose only of covering up after the crime. . . . Kidnappers in hiding, waiting for ransom, commit acts of concealment in furtherance of the objectives of the conspiracy itself, just as repainting a stolen car would be in furtherance of a conspiracy to steal; in both cases the successful accomplishment of the crime necessitates concealment.

*Grunewald v. United States*, 353 U.S. 391, 405 (1957).

Moreover,

> When the activities of alleged co[-]conspirators are interdependent or mutually supportive of a common or single goal, a single conspiracy will be inferred. Thus, if the agreement contemplates the bringing to pass of a

---

[8] These provisions are identical to the provision in the 2000 *MCM* in effect at appellant's trial.

> continuous result that will not continue without the
> continuous cooperation of the conspirators to keep it up,
> and there is such continuous cooperation, there is a single
> conspiracy rather than a series of distinct conspiracies.

16 AM. JUR. 2d *Conspiracy* § 11 (2006) (footnotes omitted).

As the Supreme Court explained sometime ago, "the character and effect of a conspiracy [are] not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *United States v. Patten*, 226 U.S. 525, 544 (1913). "[T]he precise nature and extent of the conspiracy must be determined by reference to the agreement which embraces and defines its objects." *United States v. Braverman*, 317 U.S. 49, 53 (1942), *cited with approval in United States v. Broce*, 488 U.S. 563, 570 (1989). "As such, it is ordinarily the agreement that forms the unit of prosecution for conspiracy, 'even if it contemplates the commission of several offenses.'" *United States v. Finlaysen*, 58 M.J. 824, 826 (Army Ct. Crim. App. 2000) (quoting ROLLIN M. PERKINS & RONALD N. BOYCE, CRIMINAL LAW 683 (3rd ed. 1982) (citing *Braverman*, 317 U.S. at 53)). *See also United States v. Pereira,* 53 M.J. 183, 184 (C.A.A.F. 2000) (finding single conspiracy to commit murder, robbery, and kidnapping).

Courts will view the totality of circumstances (i.e., a common goal, the nature of the scheme, overlapping participants in various dealings) to determine whether a single or multiple conspiracy exists. *Finlaysen*, 58 M.J. at 827 (citing 16 AM. JUR. 2d *Conspiracy* § 11 (2002)). Additionally, as our court has stated, in making charging decisions regarding conspiracy, "justice is not served by a charging decision that knowingly exaggerates appellant's criminality or unreasonably increases his punitive exposure." *Id.* at 828. Moreover, "it is a perversion of natural thought and of natural language to call such continuous cooperation a cinematographic series of distinct conspiracies, rather than to call it a single one." *United States v. Kissel*, 218 U.S. 601, 607 (1910).

## D. Admissibility of Co-Conspirator Statements

Military Rule of Evidence Rule 801(d)(2)(E) indicates, with emphasis added, that "a statement by a co-conspirator of a party *during the course and in furtherance of* the conspiracy" is not hearsay. In *Bourjaily*, 483 U.S. at 171, the Supreme Court held that a court in its preliminary hearing must not only consider the statements sought to be admitted, but must also make factual determinations under Federal Rule of Evidence 801(d)(2)(E) as to whether the proponent of such evidence has proved by a preponderance of the evidence (1) existence of a conspiracy involving the declarant and the nonoffering party and (2) that the statement was made during and in furtherance of the conspiracy. Military Rule of Evidence 801(d)(2)(E) further

codifies the *Bourjaily* decision by directing that "the contents of the statement shall be considered but are not alone sufficient to establish . . . the existence of the conspiracy and the participation therein of the declarant and the party against whom the statement is offered . . . ." Our court cannot overturn a military judge's finding that a statement was in furtherance of a conspiracy unless it was clearly erroneous. *United States v. James*, 1998 CCA LEXIS 78 (A.F. Ct. Crim. App. 27 Jan.1998) (unpub.) (citing *United States v. Rahme*, 813 F.2d 31, 36 (2d Cir. 1987); *United States v. Deluna*, 763 F.2d 897, 909 (8th Cir. 1984), *cert. denied*, *Thomas v. United States*, 474 U.S. 980 (1985)).

The key prerequisite then for admissibility of co-conspirator statements is whether the co-conspirator made the statement "in furtherance of the conspiracy charged" rather than "in furtherance of an alleged implied but uncharged conspiracy aimed at preventing detection and punishment." *Krulewitch v. United States*, 336 U.S. 440, 444 (1949). Courts have found co-conspirator confessions made before arrest as "in furtherance of" and post-arrest confessions not "in furtherance of." 44 AM. CRIM. L. 523, 547-48 (2007).[9] Federal courts have also held co-conspirator statements admissible under the Rules of Evidence "even if the defendant is not charged with the conspiracy" when the conspiracy is "closely related or 'factually intertwined' with the crime for which the defendant is charged." *Id.* at 546-47.[10]

---

[9] Citing *United States v. Brooks*, 82 F.3d 50, 53-54 (2d Cir. 1996) (admitting statements made to undercover officer prior to arrest); *United States v. Segura-Gallegos*, 41 F.3d 1266, 1272 (9th Cir. 1994) (holding statements made to undercover police officer not hearsay because statements were "in furtherance" of conspiracy); *Fiswick v. United States*, 329 U.S. 211, 217 (1946) (finding post-arrest admission or confession is not in furtherance of conspiracy); *United States v. Lombard*, 72 F.3d 170, 189 (1st Cir. 1995) (holding arrest terminates conspiracy, but allowing declaration based on other grounds); *United States v. Alonzo*, 991 F.2d 1422, 1425 (8th Cir. 1993) (stating confessions are not in furtherance of conspiracy).

[10] Citing *United States v. Mahasin*, 362 F.3d 1071, 1084 (8th Cir. 2004) (stating that it is "not necessary for the declarant to have been formally charged as a co-conspirator or even be identified, so long as the statement in question was itself sufficiently reliable in demonstrating the applicability of Rule 801(d)(2)(E)."); *United States v. Skidmore*, 254 F.3d 635, 638 (7th Cir. 2001) (stating government need not charge conspiracy in order for co-conspirator statement to be admitted); *United States v. Ellis*, 156 F.3d 493, 497 (3d Cir. 1998) (stating out-of-court statements may be admissible even if defendant is not formally charged with conspiracy); *United States v. Asibor*, 109 F.3d 1023, 1034 (5th Cir. 1997) (allowing

(continued . . .)

> [A] statement made by one conspirator during the life of the conspiracy, and in pursuance of it, may be accepted in evidence against all. . . .
>
> Federal authorities are legion which hold that statements made by a conspirator, once the common enterprise has reached its end, are inadmissible against co[-]conspirators. . . . However, not infrequently the commission of a criminal offense is followed immediately by an active attempt to conceal it. Thus, a rule has arisen to the effect that the declarations of a co[-]conspirator are admissible against a co[-]conspirator not only when they are made during the perpetration of the offense, but also when expressed during the course of a subsequent attempt to conceal the crime and relating to it.

*United States v. Taylor*, 6 U.S.C.M.A. 289, 293, 20 C.M.R. 5, 9 (C.M.A. 1955) (citing WHARTON, CRIMINAL EVIDENCE, 11th ed. § 715). Moreover,

> [W]hen a concealment is shown to be in furtherance of the conspiracy, [co-conspirator] statements *are* admissible in evidence. *Id*. at 294; 20 C.M.R. at 11. "[W]hether attempts to conceal a conspiracy are in furtherance of the ongoing conspiracy depends on the facts of each case . . . . In conspiracies where a main objective has not been attained or abandoned and concealment is essential to success of that objective, attempts to conceal the conspiracy are made in furtherance of the conspiracy."

*United States v. Howard*, 770 F.2d. 57, 61 (6th Cir. 1985).

---

(. . . continued)

evidence of uncharged offenses because they arise out of the same transactions as the offenses charged); *Ellis,* 156 F.3d at 498 (applying "factually intertwined" test to determine relevance of 801(d)(2)(E) evidence); *United States v. Grossman*, 843 R2d 78, 83 (2d Cir. 1988) (stating conspiracy must be "factually intertwined" with offense charged).

*Analysis*

To understand appellate defense counsel's somewhat convoluted argument, we must read Assignment of Error (AE) II in conjunction with AE V.  Appellant asserts in AE II, "the military judge committed plain error when he failed to give appropriately tailored uncharged misconduct instructions relative to the inordinate amount of evidence admitted pertaining to the *uncharged* conspiracy issues."  Appellate defense counsel claim the "uncharged misconduct" is the "uncharged conspiracy" to obstruct justice by lying to law enforcement.  Additionally, appellate defense counsel's brief, with emphasis added, explains: "The issue here in this Point *is not whether the Military Judge erred in admitting this evidence* . . . but whether once he made the decision to admit it, such mandated an appropriate limiting instruction."

However, in AE V their brief asserts: "The military judge committed plain error of a [C]onstitutional magnitude when he admitted various 'hearsay' statements of [Dr.] Theer under [Mil. R. Evid.] 801(d)(2)(E) . . . as statements of a co-conspirator . . . ."  In that portion of their brief appellate defense counsel explain that appellant was only charged with conspiring on or about "17 [December] 2000 with Dr. Theer to murder Capt[.] Frank Theer with premeditation," but the military judge allowed the government to present "irrelevant" evidence regarding "uncharged conspiracy B" with Dr. Theer "*after* 17 [December] 2000 . . . to obstruct justice by wrongfully disposing of [a] 9mm pistol" and "uncharged conspiracy C" with Dr. Theer "*after* 17 [December] 2000 . . . to 'cover up' the 'conspiracy to murder' Capt[.] Theer."  They further assert:  "It was simply a tactical ruse to get a boatload of otherwise *inadmissible hearsay* before the members and as predicted by the Defense, the Government would 'prove' the *uncharged conspiracies* and then claim that such proved the charged conspiracy."

We find appellant's argument regarding the instructions does not merit discussion,[11] but we will review the admissibility of the co-conspirator's statements as they relate to "uncharged misconduct."  Although some of Dr. Theer's statements may have also concerned efforts to cover up the murder, we cannot conclude these statements related *only* to uncharged misconduct.  On the contrary, we find all of the admitted statements were relevant to prove the charged conspiracy to commit the premeditated murder of Dr. Theer's husband.  Every criminal conspiracy has goals or objectives.  In this case, the government's theory, supported by the evidence, was that the main objectives of the conspiracy to murder Dr. Theer's husband were to allow appellant and Dr. Theer to be together and allow them to enjoy the life

---

[11] *See* footnote 2, *supra*.

insurance proceeds. During their trip to Saba Island months prior to the murder, the two held themselves out as fiancées intending to marry and set up a life on the island for several years. Doctor Theer and appellant could not have achieved these goals unless they successfully hid their criminal involvement. Accordingly, to show motive, intent, and plan, the government was permitted to introduce evidence of "acts of concealment done in furtherance of [these] main criminal objectives." *Grunewald*, 353 U.S. at 391.

The result might be different if the facts of this case were changed. For example, if appellant had been charged only with an unlawful accidental killing, then evidence of an "uncharged conspiracy aimed at preventing detection and punishment" of this crime would not be admissible under Mil. R. Evid. 801(d)(2)(e). *Krulewitch*, 336 U.S. at 444. The result might also be different if appellant had been charged with conspiring with Dr. Theer to commit murder, but the apparent motivation was only spite and revenge, then "acts of concealments done after these central objectives had been attained" also would not be admissible. *Grunewald*, 353 U.S. at 405. The actual case, however, does not resemble these hypothetical examples. On the contrary, Dr. Theer's statements were relevant to the goals and objectives of the conspiracy to kill her husband.

Additionally, for a separate reason, "[w]e hold that the military judge did not abuse his discretion . . . because the uncharged misconduct was admissible for a separate limited purpose, to show the subject matter and context of a conversation . . . ." *Young*, 55 M.J. at 196. The probative value of this evidence (to provide the context for appellant's obstruction of justice charge) substantially outweighed the danger of unfair prejudice. *See id.* (Sullivan, J. concurring in part and in the result and dissenting in part).

Moreover, as discussed in our analysis of the Confrontation Clause, even if the military judge erred in admitting Dr. Theer's statements, these statements were cumulative or not required. Other evidence properly before the court independently established either the same points or separate facts sufficient to prove the required elements of the offenses.

We agree with appellant's defense counsel's assessment at trial that "[i]f this conspiracy was planned and executed as the prosecution says that it was,[12] it was badly conceived, incompetently executed and any attempts to hide it and cover it up were done stupidly." Nevertheless, we easily conclude that if the military judge did

---

[12] Our review indicates strong evidence that it was planned and executed as the prosecution asserted.

erroneously admit Dr. Theer's co-conspirator statements those declarations were not "the weight that tipped the scales against" appellant. *Krulewitch*, 336 U.S. at 445. Error, if any, was harmless beyond a reasonable doubt.

## CONCLUSION

We have considered appellant's other assignment of error, and those matters personally raised by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), and find them to be without merit.

Accordingly, the findings of guilty and the sentence are affirmed.

Senior Judge HOLDEN and Judge WALBURN concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court